**In re John COCKRUM, Applicant.**

**No. 6:93cv230.**

United States District Court,
E.D. Texas,
Tyler Division.

Aug. 5, 1994.

Alan Bernard Rich and Lawrence Ray Lassiter, Dallas, TX, Jeffrey Dworkin, Austin, TX, for applicant.

John Jacks, Asst. Atty. Gen., Atty. Gen.'s Office, Austin, TX, for state.

## MEMORANDUM OPINION

JUSTICE, District Judge.

### I. *Background*

John Cockrum, the applicant, presents to this court a troubling and unusual, although not unique, case. Cockrum was convicted of capital murder in a Texas court and sentenced to death. He appealed his conviction and filed an unsuccessful application for the writ of habeas corpus in the state system. He then filed an application for the Great Writ before this court. Soon after filing that application, however, he decided that he no longer wanted to challenge his conviction and sentence. In the first of many letters to the court, the applicant requested that his application be withdrawn, that he be permitted to dismiss his attorneys, and that the death penalty be imposed swiftly. On July 16, 1993, this court held a hearing to determine how to proceed under these unusual facts, and determined that a full evidentiary hearing should be held to determine the applicant's competency to waive further review of his conviction and sentence. The competency hearing was held on April 11–12, 1994, and continued on July 5–6, 1994. At every stage of the proceedings, the applicant himself was given a full opportunity to question the witnesses and present evidence and testimony on his own behalf, independent of his attorneys.

■ The appropriate standard for determining competency in this situation requires answering the following questions:

(1) Is the person suffering from a mental disease or defect?

(2) If the person is suffering from a mental disease or defect, does that disease or defect prevent him from understanding his legal position and the options available to him?

(3) If the person is suffering from a mental disease or defect which does not prevent him from understanding this legal position and the options available to him, does that disease or defect, nevertheless, prevent him from making a rational choice among his options?

*Rumbaugh v. Procunier,* 753 F.2d 395, 398 (5th Cir.), *cert. denied,* 473 U.S. 919, 105 S.Ct. 3544, 87 L.Ed.2d 668 (1985); *see also Rees v. Peyton,* 384 U.S. 312, 314, 86 S.Ct. 1505, 1506–07, 16 L.Ed.2d 583 (1966) (per curiam). For the reasons set out below, it is found that Cockrum is not competent to waive further review of his conviction and sentence. Accordingly, the merits of his application for the writ of habeas corpus shall be reviewed.

The experts who testified at trial regarding the applicant's competency, under the standard set forth above, based their evaluations on the applicant's history, as well as personal interviews of varying lengths. The applicant's tragic personal history was universally viewed as critical to a determination of his current competency to waive further review. Although some of the details are disputed, the basic outline of his traumatic life is well established. His father was an alcoholic police officer who became violent when intoxicated, physically abusing the applicant, his sisters, and his mother. At a very early age—nine or ten years old—the applicant began using illegal drugs and continued to do so until he was arrested on the charges for which he was ultimately sentenced to death. At the age of fifteen, he allegedly set fire to his school and was confined to a state correctional facility for boys. His family situation did not improve when he returned home at the age of sixteen. When the applicant was seventeen, he shot his father during one of his father's drunken, abusive episodes. A few weeks later, his father died of his wounds. Before he died, the applicant's father told authorities that the shooting was an accident; therefore, the applicant never faced criminal charges arising from the shooting. However, it is clear that the shooting had a profound impact on the applicant. His drug abuse escalated, and he attempted suicide at least twice. He married and had one daughter, but his marriage failed. Eventually, he became addicted to methamphetamines. During one episode of acute methamphetamine intoxication, he allegedly murdered a convenience store clerk during a robbery—the crimes for which he has been sentenced to death.

A total of four mental health experts testified regarding the applicant's competency to

waive further review of his conviction and sentence. The first to testify was Richard Pesikoff, M.D., a psychiatrist appointed by the court to examine the applicant and determine the applicant's competency. Dr. Pesikoff diagnosed the applicant as suffering from dysthymia, a persistent, mild depression lasting more than two years. He also stated that the applicant had in the past suffered from drug abuse and antisocial personality disorder. Dr. Pesikoff noted that the applicant did not suffer from any additional psychological disorders, such as post-traumatic stress disorder ("PTSD"), and has no current suicidal thoughts. George Leventon, M.D., Dr. Pesikoff's associate and fellow psychiatrist, testified to conclusions similar to Dr. Pesikoff's, as embodied in their joint report. Drs. Pesikoff and Leventon also concluded that the applicant's mental condition did not prevent him from understanding his current legal position and options, nor did it prevent him from making a rational choice with respect to whether to waive further review of his conviction and sentence.

The applicant's counsel called two experts regarding the applicant's competency. Faye Sultan, Ph.D. a clinical psychologist, diagnosed the applicant as suffering from dysthymia, post-traumatic stress disorder ("PTSD"), and some, but not all, of the symptoms of a delusional thought disorder. Although Dr. Sultan agreed that the applicant was able to understand his position and options, she concluded that he was not able to make a rational choice among those options. Stuart Grassian, M.D., a psychiatrist, also diagnosed Cockrum as suffering from PTSD, and concluded that he is incompetent to terminate his pursuit of legal remedies.

The court also had significant opportunity to directly observe the applicant. The applicant questioned almost every witness presented during the hearings, and also testified twice in his own behalf. He was composed, coherent, courteous, and intelligent. He behaved appropriately in the courtroom, although he displayed almost no emotion throughout the proceedings. While he did not appear extremely alert, his questions and statements showed that he paid close attention to the proceedings.

## II. Existence and Type of Mental Disease or Defect [1]

■ Regardless of the differing conclusions of the experts respecting the applicant's competency to waive further review under the *Rumbaugh* standard, they agreed on a wide range of points. First, there was universal agreement that the applicant suffers from at least one mental disease or disorder, namely dysthymia, a chronic mild depression. Although there is much superficial disagreement over whether the applicant suffers from post-traumatic stress disorder ("PTSD"), the actual area of controversy is a narrow one. All experts agreed that the applicant's fatal shooting of his father was a stressor significant enough to cause PTSD.[2] It is undisputed that up until at least the late 1980s, the applicant displayed many of the symptoms of PTSD. Dr. Leventon agreed that the applicant could very well have suffered from PTSD in the past, but disagreed with the other experts' opinions that he suffers from it currently.[3] Dr. Pesikoff found no symptoms of PTSD in his interview with the applicant in December of 1993 and, when questioned about possible PTSD in the past, noted that most PTSD patients are cured.[4] In contrast, Dr. Sultan noted that the applicant displayed many symptoms of PTSD during her interviews with the applicant in early

1. Although the *Rumbaugh* test uses the phrase "mental disease or defect," *Rumbaugh* purported to follow the controlling United States Supreme Court precedent *Rees v. Peyton*, 384 U.S. 312, 314, 86 S.Ct. 1505, 1506–07, 16 L.Ed.2d 583 (1966), which articulated this first prong as encompassing the existence of a "mental disease, *disorder*, or defect." (emphasis added).

2. The experts also agreed that being on death row and various instances of childhood abuse at the hands of his father might also qualify as sufficient stressors. However, almost all of the applicant's other symptoms of PTSD clearly point back to his father's death as the primary stressor.

3. Record, April 11, 1994, at 122. In some instances, the record contains separate volumes for morning and afternoon sessions on the same day. In such instances, the morning session shall be denoted "A" and the evening session "B".

4. Record, April 11, 1994, at 72.

1992. In addition, Dr. Grassian expressed a view contrary to that of Dr. Pesikoff, to the effect that PTSD, although treatable, is a lifelong illness, at least for the applicant.[5]

Resolving such disputes is always difficult for the court, which is not an expert in such matters. However, several factors point to the conclusion that the applicant currently suffers from PTSD. The record clearly reflects ample symptoms before 1990 upon which a diagnosis of PTSD could have been made. The applicant was amnesic about the events, had recurring nightmares, intrusive thoughts, and flashbacks. The applicant reported such symptoms to Dr. Sultan as late as 1992, when she also personally observed other symptoms such as hypervigilance, avoiding thought about the trauma, and restricted affect, *e.g.*, lack of outward signs of a range of emotions.[6] One of the symptoms of PTSD—restricted affect—was displayed by the applicant throughout these hearings.[7] Other symptoms, such as a strong desire to avoid having his father's life and death discussed, are obvious in the applicant's letters to this court and others.[8] Finally, having concluded that the applicant suffered from PTSD in the past, it is highly unlikely that he is now cured, even if such a cure were common, since he has received minimal psychological and no medical/psychiatric treatment for his condition.[9] Thus it was proved, by a preponderance of the evidence, that the applicant suffers from depression and PTSD resulting from his killing of his father.

### III. *Ability to Understand Situation and Consequences of Actions*

The experts agree that, despite whatever mental difficulties the applicant has, he is able to understand his situation and the consequences of his actions. These observations comport with the court's observations as well. The applicant understands that failure to pursue habeas corpus relief will result directly in his death; indeed, it is obvious that this is the ultimate result he seeks. The applicant understands that even if he is guilty, he may have valid bases for appealing his sentence of death.[10] He has accurately informed the court that, "I know I could continue with my appeals with new lawyers, a new petition, or even pro se." [11]

### IV. *Ability to Make a Rational Choice Among Alternatives*

Because the applicant suffers from mental disorders which do not affect his knowledge of his alternatives or the effects of his choices, the dispositive question determining his competency to waive further review is whether or not his mental disorders prevent

---

5. Record, July 5, 1994(A), at 44.

6. Record, April 12, 1994, at 73–98. Dr. Sultan's observations are not inconsistent with those of Drs. Pesikoff and Leventon; the applicant could have displayed symptoms in his interviews with Dr. Sultan but not Drs. Pesikoff and Leventon. Moreover, the court agrees with Dr. Sultan's assessment that the applicant has intentionally suppressed symptoms of PTSD in order to facilitate his goal of being allowed to waive further review of his sentence. Record, April 12, 1994, at 87. This presents significant difficulties in diagnosis, as all the experts agreed that diagnosis of PTSD is based significantly on self-reported symptoms. Record, April 11, 1994, at 62–70, 141–42. *See* Section IV.5, *infra*.

7. The court carefully observed the demeanor of the applicant during these hearings, both when he was actively involved in questioning or testifying, and as he sat observing the activities of others. He retained the same expression, volume, and intensity throughout, regardless of whether the testimony was favorable to him or implied that he was incompetent, whether the witness agreed or disagreed with him. One witness, Dr. Ingle, engaged the applicant in a religious discussion on a topic of obvious interest and importance to the applicant that had a profoundly moving effect on everyone in the courtroom with the exception of the applicant. Although not an expert in psychology or psychiatry, and realizing that the courtroom environment may be intimidating, especially to a prisoner, the court found the applicant's impassivity striking.

8. Letters of July 28, 1992, December 13, 1993, April 28, 1994 (stating that he does not want to talk about his father or the past); Letters of July 28, 1992, July 29, 1992, December 22, 1992 (requesting that nothing about his father be discussed in the application for the writ).

9. Record, July 5, 1994(A), at 32, 44–45.

10. Record, July 16, 1993, at 26.

11. Letter of December 13, 1993. *See also* Record, July 16, 1993, at 26.

him from making a rational choice among his alternatives. This inquiry, like all inquiries into mental state, is extremely difficult; reliance on experts is essential. However, the credible experts disagree in the instant case; Drs. Pesikoff and Leventon concluded that the applicant's "mental condition does not prevent him from making a rational choice in determining what he wishes his legal course of action to be,"[12] while Drs. Sultan and Grassian found the applicant's thought process facially irrational, since they believe that his decision to abandon his appeals does not flow logically from the reasons he gives for his position.

Any evaluation of the applicant's rationality with respect to this particular decision must begin with the Pesikoff/Leventon report, since they are the court-appointed independent experts, and likewise because they set forth what they believe are the rational bases for the applicant's decision to waive further review. The report lists eight reasons:

1. His attorneys violated his trust by claiming that he is innocent.

2. His attorneys violated his trust by putting lies in the application about his abusive father—specifically that his father was an "every day abuser."

3. His attorneys lied about the way he killed his father, claiming that it was an accident which occurred when they were in close physical proximity when, in fact, Cockrum was across the room from his father when he shot him.

4. His trial and appeals were fair. Further proceedings hold out the likelihood only of delay rather than reversal. An application for the writ which contained no falsehoods would have no chance for success.

5. Frivolous appeals like his hurt the chances of inmates with non-frivolous appeals.

6. It is a waste of state money to continue litigating this case.

7. Dragging out the process hurts his family, especially his daughter.

8. He believes in capital punishment.

### 1. *Attorneys' Lies*

The first three reasons are all related in that they express the applicant's anger and disappointment with his attorneys for allegedly lying to him and putting facts which he considered to be untrue in his application for the writ of habeas corpus. This is obviously the primary motivation for the applicant's decision to abandon further legal review of his case. The first time the applicant was given the opportunity to address this court, he stated that he wanted to waive further review because of the lies his attorneys had brought before both state and federal courts on his behalf.[13] Later, the applicant informed the court that, after he decided to waive further proceedings, "I got complete peace with God about my decision to drop my appeals, because I had gave my attorneys two different opportunities to file a petition that was honest and right, and they lied to me, and they denied me that right both times."[14] The applicant's overriding obsession with his attorneys' alleged lies was abundantly displayed in the applicant's final address to this court; he discoursed for over an hour, creating over thirty-five pages of transcript, with a minute examination of every untruth the applicant believes has been placed in his application for the writ, or elsewhere, by his attorneys.[15] Dr. Pesikoff agreed, stating that "the lawyers' behavior really caused the termination, I think, of his pursuit [of further legal remedies]."[16]

These explanations for the applicant's decision are irrational, not only because his actions are not a logical response to the perceived problem, but also because his sincerity in claiming that his attorneys' statements are untrue is highly suspect. The applicant's anger at his attorneys for allegedly lying to him and putting perceived untruths in the

---

12. Pesikoff/Leventon Report 2.

13. Record, July 16, 1993, at 19.

14. Record, July 6, 1994(A), at 70.

15. *See also* Letters of December 13, 1993.

16. Record, April 11, 1994, at 16.

application for the writ is not a rational basis for him to waive further review of his death sentence. Dr. Grassian explained well why such a reason is irrational: "If you don't like your attorneys, you don't kill yourself as a result; you change attorneys. You don't die because you don't like your attorneys; you change attorneys. So, there's something psychotic about choosing to die because you don't like what your attorneys do." [17] The attorneys' supposed lack of candor thus cannot be a rational basis for waiving legal review.

This reason collapses further when the individual facts which the applicant claims are lies are examined in detail. The lies about which the applicant complains the most are those relating to his family, specifically his father's death, which he claims his attorneys promised would not be put in the writ application. However, the evidence does not indicate that the applicant's attorneys lied; to the contrary, they wrote the application to correspond very closely to the applicant's requested language on this obviously sensitive topic. The applicant wrote to one attorney, Larry Lassiter:

> I've given alot of thought about the mitigating part of the writ & this is the way & only way I will approve of it being in there. ["]Don Cockrum Johnny's dad was an alcoholic & when he drank he was very abusive towards his family. He was this way most of Johnny's life, with frequent beatings upon Johnny's mother two sisters & himself. In 1976 after Johnny & his father had had an argument which ended up in Johnny's bedroom with Don Cockrum beating Johnny Johnny picked up a 22 rifle & shot his father. For 6 weeks Don Cockrum lived in intensive care at Wadley hospital, but then died of Kidney failure. Johnny went through the rest of his life, never forgiving himself for his Dad's death & turning to drugs & alcohol to not have to deal with what was eating him up inside. This tragic event effected Johnny's life very much & should be considered as mitigating factors (evidence).["] Larry this is not exactly word for word the way I expect

you to write what I have said, but I do not want it taken out of text. Nothing added, nothing taken away. All the other that Joe put in about my mother & the rest of my family I want left out completely. You want to know something, ask me not my family. I know my mother loves me & would do most anything to keep me alive.[18]

The language used in the application filed with the court is very similar, and does not provide any basis for the applicant's accusation against his attorneys:

> John Cockrum's father, Don Cockrum, was a prominent and respected man and a peace officer for most of his adult life. Throughout John's youth, his father served alternately as an Investigator for the State Liquor Board, New Boston Police chief for many years, Bowie County Deputy Sheriff, and Investigator for the Red River County Attorney. Don Cockrum was also an alcoholic. Alcohol cost him his job at the Liquor Board, just as it did at the New Boston Police Department. In 1974, Don Cockrum admitted himself to Wadley Regional Medical Center for treatment of his alcoholism, but the course of the disease was too far advanced, and he drank to excess for the rest of his life....

> When he drank, Don Cockrum had the capacity for extraordinary violence and regularly beat his wife and children....

> ....

> [On June 26, 1978], Donald Cockrum was again intoxicated. He became violent, with insults escalating into pushing and shoving, and finally into uncontrolled violence. John Cockrum, who was not home when the argument started, arrived home in the midst of this commotion. John went inside and confronted his father.

> As the altercation continued, John retreated into his bedroom where, cornered by his father, he grabbed a .22 cal. rifle and warned his father to stay way. Amidst a scene of pure chaos, the two men stood on opposite sides of the bed, shouting at each other. In the struggle and confusion, the gun discharged, striking Don Cockrum in the chest.

---

**17.** Record, July 5, 1994(A), at 58.

**18.** Letter of February 19, 1994.

... After six weeks in intensive care, Don Cockrum died in the hospital on July 16, 1976 of kidney failure....[19]

There is simply no basis for the applicant's claims that the application contains untruths, when he is the source of the information himself. Moreover, some of the "lies" which he claims are in the application are simply not there. For example, the applicant complained to Dr. Pesikoff that his lawyers "violated his trust by painting his father as an all-bad person, a daily abuser, making him out to [be] a horrendous man rather than painting the full picture of a man with multiple assets and liabilities."[20] As the passage quoted above indicates, the application does note several of the elder Cockrum's positive qualities. The applicant also told Dr. Pesikoff, "that they wrote that he was in the process of pushing his father when he accidentally shot his father; when, in fact, he was across the room."[21] Once again, reading the above-quoted section of the application reveals that the applicant's complaint is unsound; the application specifically states that the applicant and his father were on opposite sides of a bed when the shooting occurred.

Several additional examples show that the applicant's claims that his attorneys have lied are unfounded, in that the attorneys' "lies" come from the applicant himself. For example, the applicant objected to the "lie" which the application contained when it stated that he turned to drugs at an early age "to satisfy his unmet psychological needs and escape the torture of his environment."[22] He testified that this was untrue. Rather, he turned to drugs because he "liked to get high; it wasn't to escape anything."[23] Yet, in the February 19, 1993, letter to Larry Lassiter, quoted above, the applicant stated that he "turn[ed] to drugs & alcohol to not have to deal with what was eating him up inside."[24]

The applicant objected to the application's negative description of the facility in which he was imprisoned as a youth. He testified that he never saw or was the victim of any abuse at the facility, and that he was even taken on a pleasant field trip to Mexico.[25] Yet he told Dr. Sultan that the conditions inside this facility were "horrible," a description which stuck in Dr. Sultan's mind, since she thought it striking that a victim of such great childhood abuse would find conditions at the facility worse than conditions at home.[26] The applicant told Dr. Pesikoff that his father "at times held a gun to his head."[27] Prison records similarly reveal that the applicant reported that his father woke him up with a gun pointed at his head and played "Russian Roulette" with him. But, the applicant denied that his father ever threatened him with a gun.[28] The applicant testified that the statement in the application that he "frequently placed himself in harm's way, absorbing the blows otherwise meant for another," was a lie.[29] Yet the Pesikoff/Leventon report notes that the applicant:

> made a conscious decision at eleven years of age that, when his father was incapacitated it fell on his shoulders to act as the 'man of the house' and deflect his father's

19. Application ¶¶ 96–97, 115–17.

20. Record, April 11, 1994, at 16.

21. Record, April 11, 1994, at 17.

22. Application ¶ 98.

23. Record, July 6, 1994(A), at 75.

24. In addition, during the applicant's lengthy final statement to the court, he repeated at least three times that the application was inaccurate in that it stated that he began using drugs at the age of nine, rather than ten, and that it misstated his age when he began using particular types of drugs and began injecting drugs. Record, July 6, 1994(A), at 74–75, 81–82; Record, July 6, 1994(B), at 9–10. None of these trivial discrep-ancies has any relevance to the substance of the application, and the applicant's obsessive insistence that they were "lies" put in the application by his attorneys to secure a reversal of his death sentence is further evidence of a defective mental process in this area.

25. Record, July 6, 1994(A), at 77–79.

26. Record, April 12, 1994, at 45–46.

27. Record, April 11, 1994, at 13.

28. Record, July 6, 1994(B), at 13–15.

29. Record, July 6, 1994(A), at 73–74. *See* Application ¶ 97.

outbursts towards himself and away from other members of his family. He did this passively, enduring emotional and physical abuse at the hands of his father including at one point his father threatening him with a gun.[30]

Dr. Sultan also reported that the applicant "actually put himself physically in the way of his sister and his mother being assaulted." [31]

It is clear from these examples alone, that the sincerity and accuracy of the applicant's accusations against his attorneys is highly questionable. Even if this were a valid cause for complaint by the applicant, his reaction to it is irrational. He has been informed, and apparently understands on a cognitive level, that he may discharge his attorneys and proceed either with other counsel or *pro se;* nevertheless, he declines to do so. Therefore, this most important basis which the applicant claims for his decision to waive further review is irrational. This irrationality is highlighted in the applicant's own letters, which imply that he does not want information about his father included in the application, regardless of its veracity.[32]

### 2. *No Chance for Success*

The next three reasons stated in the Pesikoff/Leventon report are all related, in that they depend on the applicant's own assessment that the chances for obtaining any result other than a delay in his execution date are extremely dim. This leads the applicant to waive further review, inasmuch as it is his apprehension that pursuing such relief solely for the purpose of delay is unjustified, harms people with legitimate bases for appeals, and wastes state funds.

It is obvious, and conceded by the experts and the applicant alike, that he lacks the expertise to evaluate the chances of success of any particular application for the writ. The underlying basis for the applicant's belief that he has no possibility of obtaining meaningful relief relates back to his perception that his attorneys lied in the application for the writ. Dr. Pesikoff noted that the applicant inferred that, since his attorneys put so many lies in the application, an application without lies would be devoid of merit and have no chance for success.[33] Dr. Leventon noted that in the applicant's mind, "there's no—no chance that the writ will be successful, if it's, as he puts it, an honest writ." [34] This rationale thus founders since, as noted above, the applicant's accusations that the application contains lies are not substantiated, but, rather, are contradicted by the applicant's own statements.

More importantly, even if every statement labeled a lie by the applicant were removed from the application for the writ, a number of the application's most compelling arguments for relief would remain completely unaffected.[35] The tremendous inferential leap which the applicant thus makes—that because the application filed on his behalf contains lies, no application without lies could possibly be meritorious—is irrationally broad and does not fit the facts of the instant case. In reality, the applicant, like virtually all applicants for the writ of habeas corpus, has insufficient knowledge and expertise to determine his chances for success, and must rely heavily on the advice of experts to make this determination. Moreover, the evidence indicates that the only experts to advise him on this subject have informed the applicant

30. Pesikoff/Leventon Report 2.

31. Record, April 11, 1994, at 169.

32. Letters of July 28 & 29, 1992.

33. Record, April 11, 1994, at 29–31.

34. Record, April 11, 1994, at 104. *See also* Letter of April 28, 1993 ("The realness that I will be executed in the future without me dropping my appeals is pretty sure, maybe years from now, but sure. I'm not going to wait any longer than I have to.").

35. In making this statement, the court expresses no opinion on the ultimate merit of any of the claims in the application. Rather, it simply notes that the application's claims regarding, for example, prosecutorial misconduct, failure to change venue, selection of biased jurors, and jury misconduct, are totally independent of the facts which the applicant contends are untrue; the likelihood of success of these claims is unaffected by the alleged "untruthfulness" of the application.

that his chances of success are reasonable.[36] The applicant has provided no rational basis for disagreeing with this expert opinion and forming his own contrary view.

### 3. *The Suffering of the Applicant's Family*

The applicant has repeatedly stated that one of his reasons for waiving further legal remedies is the continued suffering which his family, especially his daughter, endures from his uncertain future. Concern for the well-being of loved ones may certainly be a rational reason for taking certain action. However, there is no indication on the record that his family is suffering or that the applicant's execution would ease their suffering. Although the applicant was given every opportunity to present evidence, neither he, his attorneys, nor the state attempted to call any of his family members to testify. Additionally, in the February 19, 1993, letter to Larry Lassiter, quoted at length above, the applicant wrote a contrary statement: "I know my mother loves me & would do most anything to keep me alive." In light of this contrary evidence, the absence of any direct evidence that the applicant's assessment of his family's wishes is accurate, and the presence of other illegitimate reasons given by the applicant for forsaking legal remedies, the applicant's claims that he wants to allow himself to be executed in order to ameliorate his family's suffering cannot be credited.

### 4. *The Applicant's Belief in Capital Punishment*

Finally, the Pesikoff/Leventon report notes that the applicant wants to drop his appeals, by reason of his belief in the death penalty. However, belief in the death penalty as an abstract principle cannot, standing alone, justify the applicant's actions. Rather, he must also believe that he, as a specific individual, deserves the death penalty. Although it may

be rational in certain circumstances for an individual to conclude, based on his own acts and culpability, that he deserves the death penalty, the evidence demonstrates that the applicant has a different reason for wanting to die. This evidence, described in detail below, indicates that the applicant's desire to be executed stems from the guilt he feels from his killing of his father, as well as the mental disorders resulting from that event.

It is common for victims of child abuse to psychologically react by idealizing and glorifying their abusers while simultaneously devaluing themselves.[37] Cockrum himself fell into this pattern early.[38] These feelings were dramatically exacerbated when the applicant fatally shot his father who, mortally wounded, saved the applicant from the specter of criminal prosecution by informing the authorities that the shooting was accidental.[39] The applicant's feelings regarding his father's life and death led directly, by the applicant's own admission, to at least two attempts at suicide.[40]

Drs. Pesikoff and Leventon concluded that the applicant no longer suffers from any suicidal thoughts.[41] However, Drs. Sultan and Grassian describe a broader range of self-destructive behavior, which Dr. Grassian termed "passive suicide," and which they maintain has been a life-long pattern for the applicant, continuing through his present desire to waive further review of his death sentence.[42] This pattern includes his passively receiving his father's physical abuse in order to spare other family members, massive drug abuse resulting in multiple hospitalizations, daredevil driving on a motorcycle that resulted in at least one severe injury, and his current decision to waive habeas corpus review. At one point, the applicant even formed a detailed escape plan, including the self-destructive proviso that, "if I did get caught I would not allow them to bring me

**36.** Record, July 16, 1993, at 26–27.

**37.** Record, July 5, 1994(A), at 24–25, 34.

**38.** Pesikoff/Leventon Report 2; Record April 11, 1994, at 174; Record July 5, 1994(A), at 34–35.

**39.** Record April 11, 1994, at 174–75.

**40.** Record July 6, 1994(B), at 8.

**41.** Pesikoff/Leventon Report 5; Record April 11, 1994, at 91, 103–108.

**42.** Record, April 11, 1994, at 175, 186–88; Record, July 5, 1994(A), at 29–30, 39, 56, 62–63; Record, July 5, 1994(B), at 25.

back to death row."[43]   In addition, the applicant participated in at least three hunger strikes while in prison and overtly threatened suicide in prison on June 30, 1989—a threat authorities took seriously in light of his psychological history.

The applicant's history and actions indicate that his belief that he deserves the death penalty stems from a mental disease—post-traumatic stress disorder—which resulted from his killing his father. For this reason, it must be rejected as a rational basis for waiver of legal review. In addition to the evidence cited by Drs. Sultan and Grassian above, the applicant's own letters to this court indicate a suicidal mentality that relates back to his relationship with his father, rather than to the crime for which he was sentenced to die. "Yes in the flesh people of this world those attorneys brought it all back up about my dad.... That's why I never want to talk about it and want it all over."[44]

### V.  *Conclusion*

The detailed analysis above is not intended to imply that any habeas corpus applicant who wishes to waive further review of his sentence must present a reason for that decision which meets with a court's approval. Such an analysis is necessary in this case, by reason of the findings that the applicant does suffer from both depression and post-traumatic stress disorder, and that experts disagreed over whether these disorders prevented the applicant from making a rational choice regarding his legal options. The detailed analysis has demonstrated that none of the reasons given by the applicant is an accurate and rational basis for the applicant's decision, leading to the conclusion that the applicant is unable to make a rational choice in this area. Instead, the evidence amply illustrates that the applicant's decision is part of a pattern of self-destructive behavior which has its roots in the severe physical abuse the applicant received as a child at the hands of his father, and which was exacerbat-

ed immeasurably when the applicant fatally shot his father.

The fact that the experts reached different conclusions in the instant case is not the result of inadequacies on their part or on the part of their science. Rather, the record indicates that the applicant has been single-mindedly pursuing a course towards self-destruction for over two years. As noted before, the applicant is intelligent, and has done everything in his power to ensure that this court will permit him to withdraw his application for the writ of habeas corpus. In pursuit of that end, the applicant has changed his statements, positions, actions, and attitudes repeatedly. Most of these changes and contradictions have already been noted. One more may complete the picture.

The applicant steadfastly refuses to be labeled a psychiatric patient. He testified at length that while in prison he saw a psychiatrist for the sole purpose of securing effective medication for his severe headaches. He further stated that he was taken off psychiatric status at his psychiatrist's suggestion, since he was not truly a psychiatric patient.[45] However, Drs. Pesikoff and Grassian testified, and the applicant's prison records reflect, that he was taken off psychiatric status at his own request and against the advice of his doctors, who had diagnosed him with several psychiatric disorders, including depression.[46] To avoid being labeled a psychiatric patient, the applicant even dissembled to prison authorities twice, telling prison evaluators that he had never been hospitalized for psychiatric reasons and had never attempted suicide. He now admits the contrary.[47] The applicant's strong desire not to be labeled as mentally ill, combined with his even stronger desire to destroy himself, leads the court to agree with Dr. Sultan that the applicant "has become very schooled in the symptoms that he has been accused of hav-

---

43.  Letter of December 13, 1993.

44.  Letter of April 28, 1994.

45.  Record, July 6, 1994(B), at 19–21.

46.  Record, April 11, 1994, at 48; Record, July 5, 1994(B), at 12.

47.  Record, July 16, 1993, at 23; Record, July 6, 1994(B), at 8.

ing.... [He] is working very, very hard to appear normal and healthy." [48]

The applicant is incompetent to waive the habeas corpus review of his conviction and sentence, in that he suffers from mental disorders which prevent him from making a rational decision on this issue. The court remains sensitive to the applicant's desire for a speedy resolution of his application for the writ of habeas corpus, and will attempt to resolve the substantive issues as rapidly as possible without sacrificing accuracy.

---

48. Record, April 12, 1994, at 87.