IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

———————————————

No. 96-40793

———————————————

JOHN COCKRUM,

                                        Petitioner-Appellee,

versus

GARY L. JOHNSON, DIRECTOR,
TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
INSTITUTIONAL DIVISION,

                                        Respondent-Appellant.

———————————————

Appeal from the United States District Court
For the Eastern District of Texas

———————————————
July 29, 1997
———————————————

Before HIGGINBOTHAM, WIENER, and BARKSDALE, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

    This opinion decides an appeal.  It is also an extraordinary
account of perverse allocations of government resources in a
capital case.  In 1986, two court-appointed lawyers and an
investigator had six months to prepare for a trial that ended in a
death sentence for John Cockrum.  A state district judge in a small
community in far east Texas presided over the jury trial, running
the court with no secretary or law clerk.  The lawyers were paid
$3,500 and $3,200 respectively for their time.  After Cockrum's
death sentence and unsuccessful appeal, a federal district judge
refused to allow Cockrum to forgo further review in federal court.

The United States District Court unleashed its full power by appointing counsel and allowing these lawyers to develop over a three-year-period the trial that the federal district court concluded ought to have been conducted in the first place. Supported by a federal payroll and unfettered access to the discovery weapons of the Federal Rules of Civil Procedure, including subpoenas, the newly appointed lawyers took twenty oral depositions, including the deposition of the state trial judge, and retained a forensic psychologist and lawyer to offer expert testimony. Viewing this hypothesized trial conducted ten years after the state trial, the federal court held that the lawyers in the state trial did not provide a constitutionally adequate defense.

After oral argument and review of the entire record, we conclude that even the federal case developed with these large resources would not likely have made a difference in Cockrum's sentence.

I

A jury in Bowie County, Texas, convicted Cockrum of the murder of Eva May, an elderly lady who ran a rural convenience store and was known to keep cash for use in cashing payroll checks. Before dawn on May 29, 1986, Cockrum entered the store, which was attached to May's residence, robbed May, and then shot her in the head at close range. Jerry Morgan, who drove Cockrum to the scene, remained in the car and did not learn of the slaying until later.

The state district judge appointed Rick Shumaker and David Malaby to defend Cockrum. They in turn hired an investigator. The case went to trial in December of 1986. Confronted with powerful physical evidence and the corroborating testimony of Morgan, who entered a plea agreement, Cockrum's counsel failed to convince the jury not to convict Cockrum of capital murder.

During the punishment phase of the trial, Cockrum's counsel called Wayne Green, a corrections officer at the jail where Cockrum was held pending trial. Green testified that Cockrum had been a good prisoner. The defense also called Cockrum's mother and two sisters, who in brief and direct testimony described him as a loving son and brother — who ought not be executed. Especially important for our purposes is what Cockrum's counsel did not do during the punishment phase. The defense knew of his chronic drug use, but they decided not to pursue that side of Cockrum's history and did not attempt to use his drug problems as an explanation of the murder. They also knew that when Cockrum was seventeen years old he had killed his own father. Although they could have attempted to portray the killing as the result of domestic abuse and the cause of Cockrum's psychological instability, they chose not to mention it to the jury.

For its part, the state called three law enforcement officers from the local area who testified that Cockrum's reputation for being a law-abiding citizen was bad. It also presented evidence of Cockrum's three prior felony convictions: burglary of a building in 1979, attempted burglary in 1985, and possession of marijuana in

1986.  The jury did not, however, learn about a long list of Cockrum's other violent and destructive acts, including the killing of his father.

The jury sentenced Cockrum to death.  The Texas Court of Criminal Appeals affirmed the conviction and sentence, and the Supreme Court denied Cockrum's petition for a writ of certiorari. Cockrum v. State, 758 S.W.2d 577 (Tex. Crim. App. 1988), cert. denied, 489 U.S. 1072, 109 S. Ct. 1358, 103 L. Ed. 2d 825 (1989). Three years later, the state trial judge who had presided at Cockrum's trial rejected Cockrum's petition for collateral review of his conviction and sentence.  Without conducting an evidentiary hearing, he entered findings of fact and conclusions of law to the effect that Cockrum's trial attorneys were not ineffective in defending Cockrum during the sentencing phase.  The Texas Court of Criminal Appeals found the trial court's findings supported by the record and denied Cockrum's application for a writ of habeas corpus.  The trial court scheduled his execution for April 21, 1993.

On April 9, 1993, Cockrum wrote to the federal district court and to his attorneys to ask that the state be allowed to carry out the death sentence.  The federal court appointed Dallas attorney Alan Rich as Cockrum's counsel.  On April 16, 1993, Rich filed a petition for a writ of habeas corpus on behalf of Cockrum in the Eastern District of Texas.  The federal trial court stayed the execution, and on April 26 it forwarded to the state's counsel a copy of Cockrum's letter.  Nearly a year later, on April 11-12 and

4

July 5-6, 1994, the district court conducted a hearing on Cockrum's competency to waive collateral review, and on August 4, 1994, it held that he was not competent to do so. In re Cockrum, 867 F. Supp. 484 (E.D. Tex. 1994). Rich was then appointed to act as Cockrum's next friend. In re Cockrum, 867 F. Supp. 494 (E.D. Tex. 1994). Rich ultimately filed a federal habeas petition with twenty-five separate claims for relief. The district court allowed discovery under the Federal Rules of Civil Procedure. Then it allowed Rich to withdraw and appointed two lawyers from the Texas Defenders Service, Mandy Welch and Richard H. Burr, III, as new next friends.

Finally, in February of 1996, nearly three years after Cockrum's first federal petition was filed, the district court conducted a hearing on the four claims remaining, all others having been voluntarily dismissed: (1) suppression of evidence and failure to correct misleading testimony regarding Morgan's plea bargain; (2) trial venue; (3) jury misconduct in discussing the possibility of parole at the punishment phase; and (4) ineffective assistance of counsel at the punishment phase. In a careful and detailed opinion filed on July 25, 1996, the district court first held that the state trial court's findings on collateral review enjoyed no presumption of correctness because they were tainted by ex parte discussion on the merits between the trial judge and the state's counsel. Cockrum v. Johnson, 934 F. Supp. 1417, 1424-31 (E.D. Tex. 1996). The district court then rejected the first three claims, id. at 1431-40, but it upheld the claim of ineffective assistance

of counsel, id. at 1440-49. The district court issued a writ of habeas corpus directing Cockrum's release or retrial.[1]

## II

We turn now to the federal district court's view of how Cockrum should have been defended. In doing so, we must keep in the forefront the reality that, even if one can find fault in the failure to locate evidence or to offer known evidence, much mitigating evidence has a dark side.

## A

The district court faulted Cockrum's trial counsel at every turn and credited Cockrum's mother and sister's testimony that Cockrum's counsel had little contact with them before trial and did not seek information about mitigation witnesses. It found Malaby was not credible; that with "a little prompting," the mother and sisters could have added compelling detail to the short and nonspecific testimony given at trial. Id. at 1445. Rejecting the testimony of the two lawyers and the investigator, the district court found that "Cockrum's attorneys made no attempt to locate

---

[1] These holdings were based on federal habeas law in effect when Cockrum filed his petition. When the district court issued its opinion, it was unclear whether the Anti-terrorism and Effective Death Penalty Act, Pub. L. No. 104-132, 110 Stat. 1214 (1996), should have any effect on Cockrum's petition. Therefore, the court also analyzed Cockrum's four theories under the new statute and concluded that relief would be appropriate even under the AEDPA's more restrictive rules. 934 F. Supp. at 1449-51. Because the Supreme Court has determined that, with exceptions not relevant here, the new statute applies only prospectively, Cockrum gets the benefit of pre-AEDPA habeas law. See Lindh v. Murphy, ___ U.S. ___, ___ S. Ct. ___, ___ L. Ed. 2d ___, 1997 WL 338568 (1997).

6

witnesses to testify at the punishment phase or to investigate mitigating evidence to present on their client's behalf." Id.

According to the district court, "the near total lack of preparation by Cockrum's attorneys for the punishment phase fell below an objective standard of reasonableness." Id. at 1447. While acknowledging the difficulty of such an undertaking, the court described the case defense counsel ought to have presented:

> [Cockrum's] father was an alcoholic police officer who became violent when intoxicated, physically abusing the applicant, his sisters, and his mother. At a very early age — nine or ten years old — the applicant began using illegal drugs and continued to do so until he was arrested on the charges for which he was ultimately sentenced to death. At the age of fifteen, he allegedly set fire to his school and was confined to a state correctional facility for boys. His family situation did not improve when he returned home at the age of sixteen. When the applicant was seventeen, he shot his father during one of his father's drunken, abusive episodes. A few weeks later, his father died of his wounds. Before he died, the applicant's father told authorities that the shooting was an accident; therefore, the applicant never faced criminal charges arising from the shooting. However, it is clear that the shooting had a profound impact on the applicant. His drug abuse escalated, and he attempted suicide at least twice. He married and had one daughter, but his marriage failed. Eventually, he became addicted to methamphetamines.

Id. at 1443 n.22 (quoting In re Cockrum, 867 F. Supp. at 485). According to the district court, failing to investigate this story and relate it to the jury amounted to a violation of the first prong of Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984), which requires a showing "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."

7

In spite of David Malaby's experience in picking juries in Bowie County each week for the previous five years, the district court rejected the explanation of Cockrum's counsel that in their judgment offering evidence of their client's drug use or the fact that he shot and killed his father would not be helpful in a trial to a Bowie County jury. Defense counsel testified at the federal habeas hearing that they were concerned about opening the door during the guilt phase to the state's evidence of acts of violence. The district court observed that this concern did not explain the limited submission at the sentencing hearing because evidence of bad acts would be admissible in the penalty phase in any event. In short, the district court concluded that trial counsel could have done more.

B

Of course, a claim of ineffective assistance requires not merely ineffectiveness, but ineffectiveness that prejudices the criminal defendant. A petitioner must show "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland, 466 U.S. at 687, 104 S. Ct. at 2064. The district court, therefore, had to hypothesize what Cockrum's counsel would have discovered if they had explored Cockrum's personal history and expanded their punishment-phase presentation to make the jury more familiar with their client. According to the district court, counsel could have depicted Cockrum as a significantly more sympathetic figure than the one

8

that emerged from the truncated punishment phase that counsel chose to use.

> A reasonably competent investigation in preparation for a punishment phase in this case would have produced a wealth of readily available information about Cockrum's family background and medical history. Had she been asked, Cockrum's mother could have provided valuable insight into her deceased husband's increasing problems with alcohol and his periods of violence toward his family, the complex relationship between Cockrum and his father, and the profound impact of his father's death on Cockrum's behavior, Deposition of Barbara Sutherland, Dec. 12, 1995, at 31-39; Transcript, Feb. 22, 1996, at 89-91 (testimony of Barbara Sutherland); she could have informed Cockrum's attorneys about her son's long history of hospitalization, Transcript, Feb. 22, 1996, at 93-95 (testimony of Barbara Sutherland); and she could have provided a list of persons who thought highly of Cockrum and who would have made excellent mitigation witnesses, including Miledge Oglesby, John Blackburn, and J.R. O'Rear. See id. at 115-19 (testimony of Barbara Sutherland). Had Cockrum's medical and institutional records been subpoenaed, they would have revealed a period of institutionalization at the Texas Youth Commission's Gatesville State School for Boys, Second Amended Petition for Writ of Habeas Corpus, app. O-2, a long history of severe drug abuse, id. app. O-4, several suicide attempts, id. app. O-6; id. app. O-8, and several psychotic episodes, including one in which a twenty-five-year-old Cockrum thought that he was seventeen years old again and that his father was still alive, id. app. O-11. If a mental health examination had been conducted, Cockrum could have been diagnosed with post-traumatic stress disorder, antisocial personality disorder, polysubstance abuse, and dysthemia (long-term depression), all with their roots in Cockrum's shooting of his father. Transcript, Feb. 20, 1996, at 22 (testimony of Jack Randal Price, Ph.D.). Although it is clear that Cockrum's attorneys provided deficient performance at the punishment phase by failing to conduct any meaningful investigation, the more difficult question posed by this claim is whether counsels' deficiencies prejudiced Cockrum. The State did not, as it could have, put on evidence of unadjudicated conduct from Cockrum's past, and much of the evidence that Cockrum's attorneys could have learned possesses both aggravating and mitigating characteristics. It is thus difficult to hypothesize, in this case, what a penalty phase defense would have

9

> looked like after a reasonable investigation, much less how a jury would have reacted to it. This evidence could form the basis of a persuasive case that (1) explained why Cockrum was violent — i.e., the enduring mental health consequences of his father's killing that led to a deepening cycle of drug abuse, suicide attempts, and violence; (2) identified his potential for responsible behavior and his capacity for forming close relationships with others — i.e., his long period of employment with J.R. O'Rear, the high opinion that O'Rear, Miledge Oglesby, and John Blackburn had of Cockrum despite knowledge of his failings, and the close ties Cockrum maintained with his mother and sisters; and (3) demonstrated why, if given a life sentence, Cockrum could be rehabilitated — i.e., the crippling drug addiction and the mental diseases from which he suffered could be alleviated through the professional treatment available in the prison system and the support of his family.

934 F. Supp. at 1447-48.

The court recognized the difficulties the defense would confront with such a strategy. "[I]t would be nonsense to contend that a jury could not find a person with a long history of severe drug abuse, a diagnosis of antisocial personality disorder, and an extensive criminal record culminating in a cold-blooded murder to be a continuing threat to society." Id. at 1448. Nevertheless, it held that calling certain of Cockrum's acquaintances to the stand and dwelling on Cockrum's difficult past would have made such a large difference that Cockrum had shown prejudice.

> Had this case been made, Cockrum's chances for obtaining a life sentence would have been significantly enhanced, and there is a reasonable probability — understood as "a probability sufficient to undermine confidence in the outcome" — that a jury would not have concluded unanimously, beyond a reasonable doubt, that Cockrum posed a continuing threat to society. Strickland, 466 U.S. at 694, 104 S. Ct. at 2068.

Id.

III

10

Cockrum has not appealed the disposition of three of his four theories: suppression of evidence, improper venue, and jury misconduct. The remaining issue — ineffective assistance of counsel — is a mixed question of law and fact that we review de novo. Strickland, 466 U.S. at 698, 104 S. Ct. at 2070; Boyle v. Johnson, 93 F.3d 180, 187 (5th Cir. 1996), cert. denied, ___ U.S. ___, 117 S. Ct. 968, 136 L. Ed. 2d 853 (1997).

We will assume without deciding that Cockrum's counsel was constitutionally ineffective for failing to mount a thorough investigation of Cockrum's history. See Spriggs v. Collins, 993 F.2d 85, 87 (5th Cir. 1993) ("A court need not address both components of this inquiry if the defendant makes an insufficient showing on one."). As we will explain, however, we disagree with the district court's conclusion that any shortcomings of trial counsel at the sentencing phase met the second Strickland prong. In other words, even if we were to concur in the district court's unwillingness to give deference to the findings of the state habeas judge and the Texas Court of Criminal Appeals, and even if we were to agree with the findings of its de novo review, we are not persuaded that the error rendered the sentencing proceedings "fundamentally unfair or unreliable." Lockhart v. Fretwell, 506 U.S. 364, 369, 113 S. Ct. 838, 842, 122 L. Ed. 2d 180 (1993). We conclude that Cockrum failed to show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 104 S. Ct. at 2068. We agree, of course, that a different

11

result would have been possible.  But the second prong of Strickland demands more.  A review of the evidence the district court thought would probably have made a difference makes plain the absence of the required showing of prejudice.

The district court pointed to J.R. O'Rear, Miledge Oglesby, and John Blackburn as witnesses with "high opinions" of Cockrum "despite knowledge of his failings."  J.R. O'Rear employed Cockrum for several years as a bricklayer and would have testified that he was a good worker with a pleasant personality.  But he also would have had to admit that he ultimately refused to allow Cockrum to continue working for him because of drug and alcohol abuse. Instead of lending credence to the theory that Cockrum is a victim, cross-examination of O'Rear could have suggested to the jury that Cockrum had the ability to lead a constructive life but chose instead to pursue drugs and crime.

Blackburn's daughter Brenda was married to Cockrum for several years and bore him a daughter.  They divorced in 1984.  The couple lived on Blackburn's property, and Cockrum worked on Blackburn's construction crew.  According to Blackburn, Cockrum could be a productive, likeable worker.  But Blackburn's relationship with Cockrum also had a dark side that the prosecution could have exploited during the punishment phase.  Toward the end of the marriage, Blackburn repeatedly confronted Cockrum about the bruises he saw on Brenda's body.  He also told Cockrum that he disapproved of his abuse of alcohol.  In 1986, at the time of the trial, Blackburn admits, he harbored "ill feelings" toward Cockrum because

12

of his daughter's failed marriage. Although he claims he would have been willing to testify on Cockrum's behalf at the punishment phase, the prosecution could have turned his testimony against Cockrum by intimating that Cockrum's crime fits into a larger pattern of violent, anti-social conduct.

Miledge Oglesby was an itinerant minister and school teacher who got to know Cockrum when Cockrum was in the seventh grade. Oglesby was fond of Cockrum and wanted to help him, but once again cross-examination could have seriously damaged Cockrum's case. Cockrum was a problem in school from the moment Oglesby met him. Oglesby "ran interference for him for years" by attempting to smooth over his relationships with other school officials. When Cockrum was in danger of being expelled for ransacking the band hall, Oglesby persuaded the school board instead to transfer him to Hooks, another high school. Oglesby had a heart-to-heart discussion with Cockrum about his tenuous future and emphasized that he had gone out of his way to help Cockrum. Cockrum promptly tried to burn down the Hooks school with kerosene. Once apprehended, Cockrum became a youthful offender under the supervision of the Texas Youth Council and spent a year away from his abusive home environment. Within a year of returning home, he had killed his father. Even Oglesby has admitted that Cockrum had a "Jekyll and Hyde" personality. A jury listening to this tale could easily view Cockrum's response to Oglesby's heroic efforts as contemptuous. Again, the facts are at least as consistent with the theory that Cockrum is entirely responsible for his own deep-seated

13

destructive tendency as with the theory that he is at least partially a victim of abuse and tragedy.

As difficult as it is to see how Oglesby's testimony could have helped, it is not the most problematic evidence that, according to the district court, Cockrum's counsel should have offered. In the story of Cockrum's killing of his father, the district court saw a life story of abuse by an alcoholic father. But the story is more volatile than that. The father was a Bowie County deputy sheriff, and the prosecution could have raised troubling questions about the account of the killing in the father's medical records. Those records stated that "in the course of the fight, [Cockrum] became extremely angry, picked up a .22 caliber rifle, put in a shell and shot his father." There is evidence that local authorities did not prosecute Cockrum because his father told his fellow deputies in a dying declaration that the shooting was an accident. To succeed in the strategy the district court imagines, the defense had to present Cockrum as a victim of abuse justifying the killing. But this evidence lay as a springboard for the state to ridicule claims of abuse. Cockrum's father's statement was arguably a compassionate attempt to protect the very son who took the time to get a gun, load it, and shoot him.

Compounding this difficulty, it is doubtful that Barbara Sutherland, Cockrum's mother, would have testified to abuse. The district court failed to attend to her testimony in a December 12,

14

1995, deposition that there was no abuse and that theirs was a loving home.

> I felt like they had put it very harshly, that there was no child abuse. I mean, I don't know what people call child abuse. Nowadays, all you have to do is hit a child and it's reported child abuse. But we grew up in a loving family and I know that there was times that the children were whipped — if you want to say this — or punished by their father, more so when he was drinking, and it was because he wanted them to be better than maybe what he was doing right then with his life.

Sutherland admitted that her husband was sometimes abusive when he was drinking, but she said that the lawyers had misrepresented Cockrum's family life.

There is powerful evidence that Cockrum himself would not have supported the abuse theory. Indeed, he tried to abandon his appeals when his lawyers attempted to portray Cockrum's father as abusive, only to have the federal court conclude that he was not competent to make that decision. Moreover, his family supported his decision and refused to assist the lawyers at the competency hearing in 1994. Only later, in the December 1995 deposition and the February 1996 hearing on the merits, did Sutherland agree to testify — nearly 10 years after Cockrum's conviction. Even then, the details of abuse were sketchy, and she did not describe the killing of her husband. Habeas counsel carefully steered clear of the question.

Dr. Price, the psychologist, offered the central theory that shooting his father exacerbated Cockrum's difficulties. But Price also conceded that the medical records the district court said should have been used reflect a diagnosis of Cockrum as a sociopath

15

— a diagnosis made before Cockrum killed his father. Price testified at the federal hearing that he would have testified, if asked, a decade before that Cockrum would likely not pose a danger in prison. In order to probe Dr. Price's present certainty about hypothesized testimony he would have given, the state sought to pursue the suggestion that Cockrum had in fact stabbed a fellow inmate. The federal trial judge refused to allow this line of questioning. Regardless, even if Cockrum had allowed the use of a psychologist, which we doubt, calling a psychologist in the sentencing phase was fraught with risk. As the state's brief points out, "a psychologist would have been require[d] to account for Cockrum's extensive history of antisocial conduct . . . . Further, a psychologist would be required to concede that Cockrum would be a future danger if not imprisoned and held under specific conditions." This history included Cockrum's failure to benefit from his prison incarceration as a youthful offender.

Even Cockrum's expert witness at the federal habeas hearing, an experienced criminal defense lawyer who was critical of defense counsel's preparation, could not say that he would have presented evidence of Cockrum's troubled past. The violence and drug abuse, this expert admitted, had the potential to turn the jury against Cockrum. The expert took the defense counsel to task for failing to make better use of Cockrum's mother and sister at trial. By drawing out more detail, he explained, the attorneys could have humanized the defendant. This fails, however, to credit the force of a mother's simple plea for her son's life. And it ignores the

16

line counsel walked to keep from the jury the fact that Cockrum had killed his own father. Pushing harder would have invited the prosecutor to explode the image of a sweet, loving son.

In sum, we pass over the district court's decision that Cockrum's defense was ineffective under the first prong of Strickland and move directly to the trial that ought to have been, as constructed by the district court. Perhaps counsel could have done more to locate evidence. Accepting the district court's decision that the lawyers failed to do so, we have the benefit of what the district court points to as evidence they should have found. The district court's conclusion that Cockrum did not receive constitutionally adequate counsel during the sentencing phase falters at this point. Given the back edge of the case that the district court found ought to have been presented, we cannot conclude that doing so would probably have produced a different decision by the jury. We know that the strategy adopted did not work. Colored by that knowledge, it is easy to conclude that the result of the post-hoc version would have been better — it certainly could not have been worse. But even with the post-hoc look, we cannot find a reasonable probability of a different outcome. The jury was not told of Cockrum's prior imprisonment, his physical abuse of his wife, his killing of his father, his extensive drug use, or his ransacking of one school and the burning of another in the face of Oglesby's long efforts to help him. A strategy of presenting Cockrum as a sympathetic figure, to be spared for his brutal killing, would have required at least these

17

disclosures.  It is possible that, spun together as the district court suggested, this east Texas jury would have spared his life. But even that is a stretch, and even that is not enough.  See Hernandez v. Johnson, 108 F.3d 554, 562-64 (5th Cir. 1997); West v. Johnson, 92 F.3d 1385, 1410 (5th Cir. 1996), cert. denied, ___ U.S. ___, 117 S. Ct. 1847, ___ L. Ed. 2d ___ (1997); Woods v. Johnson, 75 F.3d 1017, 1035 (5th Cir.), cert. denied, ___ U.S. ___, 117 S. Ct. 150, 136 L. Ed. 2d 96 (1996); Callins v. Collins, 998 F.2d 269, 278 (5th Cir. 1993), cert. denied, 510 U.S. 1141, 114 S. Ct. 1127, 127 L. Ed. 2d 435 (1994) (all rejecting ineffective-assistance claims where alleged failures to investigate mitigating evidence did not prejudice the defendant because of the double-edged nature of the evidence available).

The judgment of the district court is REVERSED.