**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 97-20468

KENNETH RAY RANSOM,

Petitioner-Appellant,

VERSUS

GARY L. JOHNSON, etc.,

Respondent-Appellee.

Appeal from the United States District Court
For the Southern District of Texas

October 21, 1997

Before KING, JOLLY, and DENNIS, Circuit Judges
DENNIS, Circuit Judge:

Appellant Kenneth Ray Ransom has been sentenced to death by the State of Texas for the murder of Arnold Pequeno. His execution has been scheduled for October 28, 1997. Ransom's conviction and sentence were upheld by the Texas Criminal Court of Appeals. Ransom v. State, 789 S.W.2d 572 (Tex. Crim. App. 1989). The United States Supreme Court denied certiorari. Ransom v. State, 497 U.S. 1010 (1990). Following unsuccessful post conviction actions in Texas state court, Ransom petitioned the federal district court for a writ of habeas corpus. The district court denied habeas relief

and subsequently refused to grant a Certificate of Probable Cause ("CPC"). Ransom v. Johnson, No. H-96-0344 (S.D. Tx. 1997). Ransom filed motions for a stay of execution and for CPC in this court. After considering the briefs, pertinent parts of the record, and other materials, we deny the motions for stay of execution and certificate of probable cause.

## I. FACTS[1]

Appellant was with his girl friend, Wanda Phillips, at her home for most of the day on June 30, 1983. After seven o'clock p.m., James Randle, a friend of appellant, came to Phillip's [sic] home to talk with him. Appellant and Randle went outside -- away from Wanda and her small daughter. The two talked for about fifteen minutes. Randle left and appellant came back into the home. Later, Randle returned to the home for a second time. The two went outside again to talk for about fifteen minutes. Randle left, but between nine thirty and nine forty-five p.m., he returned to the home and for a third time he and appellant went outside to talk. Both men went into the kitchen after this third discussion. While there, they removed a butcher knife from the dish drainer. Randle told appellant, "Oh man, here's one that we can use." As they started to leave with the knife, Phillips asked appellant where he

---

[1] We adopt verbatim the statement of the facts by the Texas Court of Criminal Appeals in Ransom v. State of Texas, 789 S.W.2d 572 (Tex. Crim. App. 1989). State court findings of fact are presumed correct as provided in 28 U.S.C. § 2254. Ransom does not, in the motions before us, challenge the Texas Court of Criminal Appeals's findings of fact, and they do not "otherwise appear" to fall under any of the circumstances enumerated in section 2254 (d)(1)-(8). Accordingly, these facts are presumed correct. 28 U.S.C. § 2254 (d)(1994).

was going and said that she needed her knife. Appellant responded that they were going to pick up Randle's cousin's paycheck. Randle told her, "Hold on you're going to get your knife back. We'll bring the knife back."

Between nine thirty and ten o'clock p.m. that night, Randle's mother saw Randle with Richard James Wilkerson, Randle's cousin, and "another boy" at her home. Randle's younger brother, Jessie, saw appellant leave with Randle and Wilkerson at some time before midnight. Earlier that day, Randle's mother had borrowed a butcher knife from one of her neighbors but was later unable to find it.

At approximately ten o'clock that night, Wilkerson's sister saw appellant standing outside her home when she unlocked the screendoor to let her brother inside. Wilkerson went into the kitchen and rummaged through the drawer where the family kept the butcher knives. Randle waited in the kitchen doorway. After going through the drawer, Wilkerson went into the bedroom with Randle. The two went outside five or ten minutes after they had arrived at the home. When Wilkerson's sister locked the door behind them she saw appellant speaking with Wilkerson and Randle. The three left together.

Anil Varughese, Rod Harris, Arnold Pequeno and his younger brother, Joerene Pequeno, were employees of the Malibu Grand Prix Race Center in Houston. The race center, which contained numerous video games inside the center and had a racetrack for gocarts outside, was open for business from ten o'clock a.m. until midnight. Richard James Wilkerson had also been employed by the

3

race center but his employment was terminated on June 20, 1983. Wilkerson could not pick up his last paycheck until June 30, 1983 -- the day that appellant told Phillips that he was going to pick up Randle's cousin's paycheck. Before Wilkerson could get the check he had to appear in person at the race center and sign his time card indicating that he had received it. As of two-thirty p.m., on June 30, 1983, Wilkerson had not picked up his check.

Late that night, at three o'clock a.m. on July 1, 1983, appellant with Randle and Wilkerson returned to Phillips' home. Wilkerson was carrying a black satchel. Appellant went into the bathroom and the other two men went into the bedroom. All three men had blood on their clothing. Appellant, while in the bathroom, tended to a severe cut on the inside of his right hand.

Inside the bedroom, Wilkerson poured the contents of the black satchel--currency, a wallet, a calculator and a watch--onto the bed. Some of the money was bloody. The three men counted it together after which Randle gave appellant a share. Phillips estimated appellant's share to be around three hundred and twenty-five dollars. Appellant counted the money, put it into his pocket and began watching television with the two other men. Wilkerson and Randle talked of how they had "slashed" somebody's throat and "put the knife in someone['s] temple." Phillips, while the men watched television, began cleaning her kitchen. She discovered that a billfold, some credit cards and a driver's license had been discarded in the garbage, the driver's license had the name "Roddy Harris" on it. Randle took the billfold, the credit cards and the

4

license away from Phillips and threw them into the dumpster.

When Phillips asked appellant from where the money had come, he replied, "We just went and got some money." Phillips and appellant, that next day, used the money to purchase clothing for themselves.

Early that morning, at around eight o'clock a.m., the bodies of Anil Varughese, Rod Harris, Joerene Pequeno and Arnold Pequeno were discovered at the race center by a friend of Varughese. Anil Varughese's body was discovered in the manager's office. He had been stabbed at least eight times -- five times in the chest and three times in the abdomen. He was eighteen at the time of his death.

The other three bodies were found in one of the race center's bathrooms. Rod Harris' body was found in one of the stalls. He had been stabbed at least seven times in the chest. Joerene Pequeno's body was found in the other stall. He had been stabbed eleven times -- once in the chest, once in the neck, once in the back, and once in the right hand; he had been stabbed seven times in the neck area with one cut severing his jugular vein. Arnold Pequeno's body was in the bathroom corner with his head under one of the urinals. He had been stabbed and cut twenty-two times in the neck, chest, abdomen, back and right hand. One of the cuts to his neck severed his jugular vein. Arnold's watch and class ring were missing along with a black satchel in which he carried his school books. At the time of their deaths, Rod Harris was twenty-two years old, Arnold Pequeno was nineteen and his younger brother,

Joerene, was eighteen.

The three victims' blood covered the bathroom floor and was splattered on the walls and ceiling. There was blood not matching that of the victims on the sink's counter, on a paper towel and on the bathroom door. A trail of blood led out of the bathroom, through the race center and into the parking lot area. Analysis revealed that this blood could not have come from any of the victims or from either Randle or Wilkerson. Only appellant's blood was genetically compatible to it.

The fingerprint to appellant's left index finger was lifted from the door to the bathroom stall where Harris' body was found. The print was discovered on the inside of the door at the top. Randle's fingerprint was lifted from the inside of the door to the bathroom stall where Joerene Pequeno's body was found.

Over thirteen hundred dollars was missing from the race center's safe and petty cash drawers. Wilkerson's last paycheck was also missing. His time card had been signed and was found laying on the manager's desk.

The knife that was taken from Phillips' home was discovered in an area near the racetrack. The knife was broken into pieces.

Late that evening on the day that the bodies were discovered, appellant was with Phillips. The two were watching television. A news story about the murders was broadcast. Upon seeing the story, appellant was visibly upset. At around seven o'clock that evening, appellant told Phillips that he was going to Wharton, Texas. The last time Phillips saw appellant, he was wearing a high school

class ring and a watch both of which were identical to the ones that Arnold Pequeno had been wearing before his murder. Phillips had never seen appellant wear the ring or the watch before that day. Also, the calculator that was in the satchel along with the satchel itself were identified at trial as belonging to Arnold Pequeno.

## II. PROCEDURAL HISTORY

On June 15, 1984, Ransom was convicted of the capital murder of Arnold Pequeno and sentenced to death. State of Texas v. Kenneth Ray Ransom, No. 384,336 (176th Judicial District Court of Harris County, Texas, June 15, 1984). Following unsuccessful appeal and post conviction actions in Texas state courts, Ransom petitioned the United States District Court for the Southern District of Texas for a stay of execution and a writ of habeas corpus on April 22, 1996. The district court granted the stay. On March 6, 1997, the district court denied habeas relief in a sixty-page order, applying the Antiterrorism and Effective Death Penalty Act ("AEDPA") standards. Ransom v. Johnson, No. H-96-0344 (S.D. Tx. 1997).

On June 13, 1997, the Supreme Court issued its opinion in Lindh v. Murphy, --- U.S. ---, 117 S. Ct. 2059 (1997), holding that the AEDPA does not apply to cases pending at the time of its effective date of April 24, 1996. In response to the Lindh decision, Ransom moved to alter or amend the district court's judgment. That motion was denied. Ransom filed a notice of appeal and a request for CPC. The district court denied the CPC and

7

vacated its stay.  Ransom's execution date of October 28, 1997 was then set by the state court.  On August 21, 1997, Ransom filed in this court a motion to stay the execution.  Ransom filed a motion for CPC on September 26, 1997.

### III. STANDARD OF REVIEW

We apply pre-AEDPA standards to this habeas petition filed prior to the effective date of the AEDPA for relief from a Texas death sentence.  See Green v. Johnson, 116 F.3d 1115, 1120 (5th Cir. 1997)(applying pre-AEDPA standard to case filed before effective date of act as Texas had not met opt-in requirements for capital cases).

The merits of Ransom's claim may be reviewed only if the court grants a certificate of probable cause ("CPC").  An appellate court is without jurisdiction to address the merits of an appeal from a district court denial of habeas relief unless it grants a CPC. James v. Cain, 50 F.3d 1327, 1330 (5th Cir.), cert. denied, -- U.S. --, 116 S. Ct. 310 (1995).

To obtain a CPC, Ransom must "make a substantial showing that he has been denied a federal right."  Barefoot v. Estelle, 463 U.S. 880, 893 (1983). Ransom must "demonstrate that the issues are debatable among jurists of reason; that a court *could* resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further."  Id. at 893 n.4; James, 50 F.3d at 1330.  The nature of the penalty in a capital case is a relevant, but not determinative, factor in deciding whether to grant a CPC.  Rector v. Johnson, 120 F.3d 551, 558 (5th

8

Cir. 1997).

A stay will be granted only upon a showing that "there are substantial grounds upon which relief might be granted." James, 50 F.3d at 1330.

### III.  DISCUSSION

Ransom advances two constitutional arguments in this appeal.[2] Ransom argues that he was denied effective assistance of counsel during the penalty-phase of his trial because counsel failed to discover and present mitigating evidence.  Ransom also argues that his due process rights were violated when the trial court refused to instruct the jury on a lesser included offense.

### A.  Ineffective Assistance of Counsel

Ransom contends that he received ineffective assistance of counsel during the penalty phase of his trial, because counsel failed to conduct a reasonable investigation into his background and to present mitigating evidence.

Ransom is entitled to effective assistance of counsel at all stages of his criminal trial, including the sentencing phase.  A claim of ineffective assistance of counsel has two components. Strickland v. Washington, 466 U.S. 668 (1984).  First, a defendant must show deficient performance of counsel.  A defendant must then show prejudice resulting from the deficiency.  Failure on either prong defeats the claim.  Tucker v. Johnson, 115 F.3d 276, 280 (5th

---

[2]  Ransom also argues that his petition must be remanded to the district court because the district court erred in applying AEDPA standards to his claims.  As we conclude that Ransom's claims fail under pre-AEDPA standards, we deny this request.

Cir. 1997)(citing Strickland, 466 U.S. at 697). A claim of ineffective assistance of counsel is a mixed question of law and fact which appellate courts review *de novo*. Green, 116 F.3d at 1122.

Under the first prong, counsel's performance is compared to an objective standard of reasonableness. Strickland, 466 U.S. at 688-90. Judicial scrutiny of counsel's performance is highly deferential to counsel whose performance is strongly presumed to "fall[] within the wide range of reasonable professional assistance." Id. at 689. Tactical and strategical decisions of counsel "if based on informed and reasoned practical judgment" will not be second-guessed. McCoy v. Lynaugh, 874 F.2d 954, 964 (5th Cir. 1989)(quoting Mattheson v. King, 751 F.2d 1432, 1441 (5th Cir. 1985)[])).

Under the second prong, a defendant must show that prejudice caused by the deficiency is such that there is a reasonable probability that the result of the proceedings would have been different. Id. at 694. The mere possibility of a different outcome is not sufficient to prevail on the prejudice prong. Cockrum v. Johnson, 119 F.3d 297, 302 (5th Cir. 1997). Rather, the defendant must show that prejudice rendered sentencing "fundamentally unfair or unreliable." Lockhart v. Fretwell, 506 U.S. 364, 369 (1993).

Ransom argues counsel would have discovered his child welfare case file had counsel mounted a thorough investigation. The case file would have provided the defense with a wealth of information

including the following: during his childhood Ransom was regularly subjected to physical, emotional, and possibly sexual abuse at the hands of his mother and older siblings; he was shuttled between his mother and a foster parent; Ransom had positive traits to which his former foster mother could have testified.[3] Instead,

_____

[3] The state trial court in post conviction proceedings found that the case file contained the following:

. . . Kenneth Ransom, born on April 15, 1963, was one of six boys who lived with their mother; that initially all of the children were in foster care, and all except a Kenneth Ransom returned home; that, on May 18, 1973, many V-shaped marks were found on the back, both flanks, and the arm of a Kenneth Ransom, and a Kenneth Ransom was placed in the James Dorsey foster home; that a report dated May 21, 1973, notes that it was a Kenneth Ransom [who] had been burned severely with hot water, that a Kenneth Ransom had a thickened keloid in the right pubic region and a dark pigmented burn area on his foot, that both arms and thighs are covered with old and new scars from extension cord licks, and that a Kenneth Ransom had a scarred face; that, on June 7, 1973, temporary custody of a Kenneth Ransom was granted to the Harris County Child Welfare Unit due to alleged physical abuse and neglect by his biological mother; that, on February 14, 1975, a Kenneth Ransom was removed from the Dorsey foster home and returned to his own home after his mother received counseling and expressed interest in having Kenneth Ransom returned to her home; that, on May 9, 1975, an elementary school principal and school nurse reported that a Kenneth Ransom had come to school with bruises and cuts on his back and arm, and a Kenneth Ransom told the elementary school principal and school nurse that his mother had whipped him; that, on May 12, 1975, a Kenneth Ransom was again placed in the James Dorsey foster home; that, on June 17, 1975, temporary managing conservatorship of a Kenneth Ransom was awarded to the Harris County Child Welfare Unit; that, on July 16, 1975, Harris County Child Welfare was granted permanent managing conservatorship and the parental rights of a Pearlie Mae Ransom were terminated; that a Kenneth Ransom had made As and Bs in school; that, in October, 1975, a Kenneth Ransom began shoplifting; that, in August of 1976, a Kenneth Ransom was arrested for shoplifting; that in September of 1976, a Kenneth Ransom was again arrested for shoplifting; that, on January 22,

11

counsel presented no evidence whatsoever at the punishment hearing.

Ransom further contends that counsel was on notice that the case file existed because of his prior relationship with the family. Ransom points to the affidavits of his trial counsel, Wesley Hocker and Roy Jerue, which were offered by the state at state post conviction proceedings. Wesley Hocker was appointed lead counsel. Because he was the family attorney, Roy Jerue was

1978, a Kenneth Ransom ran away from the Dorsey foster home; that, on February 14, 1979, a Kenneth Ransom returned to the Dorsey foster home; that, a report dated March 21, 1978, notes that school reports indicate that a Kenneth Ransom "is very intelligent with great learning potentials, but he wants to study whatever he pleases instead of the class assignments;" that, on July 12, 179, a Kenneth Ransom was placed in the Chimney Rock Center; that, on August 24, 1979, a Kenneth Ransom was placed with his maternal aunt, Earline Parlaine, in Wharton, Texas; that in November, 1979, a Kenneth Ransom left his maternal aunt's house to live with his girlfriend; and, that a Kenneth Ransom began having problems with the police in 1980 and was involved in several burglaries and thefts. The [county] records, include a report, dated January 21, 1981, noting that Kenneth Ransom was a "bright kid with the potential for success" and that it was a "shame" that a Kenneth Ransom had ruined his life.

20. The Harris County Children's Protective Services recrds . . . contain a psychological evaluation of a Kenneth Ransom, dated September 21, 1973, reflecting that a Kenneth Ransom liked Mrs. Dorsey, his foster parent. A psychological report, dated August 28, 1974, reflects that psychological testing did not indicate that a Kenneth Ransom was still suffering from any alleged abuse that he received as a child, and that considering Kenneth Ransom's early development, Kenneth Ransom seems to have adjusted "quite well." The August 28, 1974 psychological report further notes that Kenneth Ransom is in the average range of intellectual functioning and demonstrates no mental disorder. A psychological screening summary, dated July 13, 1979, indicates that on . . . a nonverbal test of intelligence, a Kenneth Ransom performed within the dull normal to average range.

Ex parte Ransom, No. 29,820-01 at 1025-28.

12

appointed to assist Hocker. Hocker Aff. ¶ 3. Jerue was responsible for investigations for the penalty phase. Jerue had known the family since 1973 and had "either represented [Ransom's mother] or her children as guardian ad litem in a proceeding wherein it was alleged that Pearlie had neglected her children." Jerue Aff. ¶ 2. Ransom argues that Jerue's knowledge of the Ransom family background was sufficient to put counsel on notice that Kenneth was abused as a child.

The state offered the affidavits of both of Ransom's trial counsel in support of its argument that counsel was not deficient. The affidavits show the following in support of the state's claim. Neither Ransom nor any other person told Jerue that Ransom had been abused as a child. Id. ¶ 6. Jerue conducted the following investigation for the penalty phase: (1) traveled to Wharton, Texas to interview unnamed persons; (2) interviewed Ms. Ransom; (3) interviewed one of Ransom's brothers.

Standing alone, Jerue's failure to conduct further investigation for childhood abuse may have been professionally deficient. Although failure to present mitigating evidence during the penalty phase of a capital trial is not, *per se*, ineffective assistance of counsel, see e.q., West v. Johnson, 92 F.3d 1385, 1408 (5th Cir. 1996)(collecting cases), cert. denied, -- U.S. --, 117 S. Ct. 1847 (1997), counsel has a duty to make a reasonable investigation of defendant's case or to make a reasonable decision that a particular investigation is unnecessary, Strickland, 466 U.S. at 691. The reasonableness of investigation decisions depends

13

in part on information supplied by the defendant.  McCoy, 874 F.2d at 964.

The state argues that Jerue had no reason to suspect abuse because Ransom never told Jerue that he was abused.  In determining the reasonableness of decisions not to investigate, information provided by the defendant is only one factor,[4] but in some cases it may be the controlling fact, see, e.g., McCoy, 874 F.2d at 964. When counsel is on notice of potential mitigating evidence, counsel is no longer justified in relying exclusively on the defendant for information.  Cf. East v. Scott, 55 F.3d 996, 1006 (5th Cir. 1995)(counsel not ineffective for failing to investigate mental history when "nothing . . . would have put his counsel on notice that [defendant] was mentally ill."); see also West, 92 F.3d at 1408-09 (counsel not ineffective for failing to investigate physical/psychological problems when "given no reason to suspect anything in that regard"); Andrews v. Collins, 21 F.3d 612, 623 (5th Cir. 1994)("Because counsel had no reason to believe that pursuing further investigation into Andrews' . . . background would be useful, 'counsel's failure to pursue those investigations may not . . . be challenged as unreasonable'")(quoting Burger v. Kemp,

---

[4]  In Strickland, the Supreme Court instructed as follows:

> The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions.  Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant.  In particular, what investigation decisions are reasonable depends critically on such information.

466 U.S. at 689.

14

483 U.S. 776, 795 (1987)), cert. denied, 513 U.S. 1114 (1995). Here, Jerue had known the family both socially and professionally for over two decades. More importantly, Jerue had represented Ransom's mother or the children in proceedings to terminate Ms. Ransom's parental rights. Jerue Aff. ¶ 2. By his own admission, Jerue knew of "the problem of neglect within the Ransom family." Jerue Aff. ¶ 6. It was just such knowledge of the family that prompted the court to appoint Jerue as second chair to "act[] as a liaison with Ransom's family. . . ." Hocker Aff. ¶ 2. Under these circumstances, even with the benefit of highly deferential review, Jerue's failure to investigate, standing alone, may have fallen "'below an objective standard of reasonableness' for professional performance." East, 55 F.3d at 1006 (quoting Theriot v. Whitley, 18 F.3d 311, 313 (5th Cir. 1994)).

The state argues that performance was, nonetheless, within the realm of professional reasonableness because lead counsel Hocker contends that he would not have presented evidence of abuse, even if he had known of it, as the defense theory was innocence. Hocker Aff. ¶ 5. Counsel's decisions to present no evidence in the penalty phase and to rely totally on the rather weak exculpatory evidence rejected by the jury in the guilt phase is very troublesome. Nevertheless, we need not decide whether counsel's performance was deficient, for we find that counsel's ineffective assistance did not undermine the outcome and, therefore, Ransom's claim falls under the prejudice prong of Strickland.

To prevail on the prejudice prong of Strickland, there must be

15

more than the mere possibility of a different outcome. <u>Cockrum</u>, 119 F.3d at 302. Ransom must show "evidence of sufficient quality and force to raise a reasonable probability that, had it been presented to the jury, a life sentence would have resulted." <u>Andrews</u>, 21 F.3d at 624. The prejudice resulting from counsel's errors must render sentencing "fundamentally unfair or unreliable." <u>Lockhart</u>, 506 U.S. at 369.

We conclude that Ransom has not met this burden. The alleged mitigating evidence when weighed against the evidence heard at the guilt phase of the trial outweighs any prejudice resulting from errors of counsel. <u>Tucker</u>, 115 F.3d at 280. The district court accurately catalogued the following evidence presented at trial:

> . . . Dr. Joseph Jachimczyk testified that Arnold Pequeno received twenty-two (22) cuts and stab wounds to his body. (Statement of Facts -- Trial, at vol. XXII, pp. 492-95). Pequeno suffered wounds to the upper abdomen penetrating the liver, to the chest, to the neck severing the jugular vein, to the back puncturing the left lung, and to the left hand. The wounds to Pequeno's left hand were consistent with defensive wounds as Pequeno attempted to ward off [the] attack. Moreover, at the sentencing the jury heard evidence that Ransom had committed burglary and unauthorized use of a motor vehicle. Michael Anthony Lee also testified that on June 25, 1983, just days before the murders, Ransom stabbed him multiple times

16

> on the sides of his face during an attempted robbery and threatened, "Don't make me kill you Mike."
>
> (Statement of Facts -- Punishment Trial, at vol. XXIV, pp. 24-40).

Ransom v. Johnson, No. H-96-0344, at 49 n.30. Balancing this evidence with the alleged mitigating evidence, we conclude that Ransom has failed to carry his burden of proving sufficient prejudice. See Hernandez v. Johnson, 108 F.3d 554, 563 (5th Cir. 1997)(holding that the gruesomeness of the crimes would have outweighed alleged mitigating evidence); Cockrum, 119 F.3d at 304 (collecting cases rejecting ineffective assistance claims where alleged failures to investigate mitigating evidence did not prejudice defendant).

Moreover, the case file also contained evidence that, if disclosed, would have been detrimental to Ransom's case. See Cockrum, 119 F.3d at 304 (failure to investigate mitigating evidence did not prejudice the defendant because of the double-edged nature of the evidence); West, 92 F.3d at 1410 (evidence that defendant was drinking on the evening of the killing is "at best a two-edged sword"). For example, the case file contains evidence that Ransom had been arrested for shoplifting and was involved in numerous burglaries and thefts. It also contained several psychological evaluations of Ransom which concluded that he was no longer affected by his childhood sufferings, he had adjusted "quite well," and he was of normal intelligence. See supra, note 3.

17

For these reasons we cannot conclude that the case file contained "evidence of sufficient quality and force to raise a reasonable probability that, had it been presented to the jury, a life sentence would have resulted." See Andrews, 21 F.3d at 624.

B. Beck Claim: Due Process, Lesser Included Offense Claim

In Cordova v. Lynaugh, 838 F.2d 764, 767 (5th Cir.), cert. denied, 486 U.S. 1061 (1988), this court held that the Eighth Amendment as made applicable to the states by the Fourteenth Amendment and the Due Process clause of the Fourteenth Amendment require that a jury in a capital case be allowed to consider convicting the defendant of a lesser included, noncapital offense if the jury could rationally acquit the defendant of the capital crime and convict the defendant of the noncapital crime. In Cordova, this court stated:

> As explained in Hopper v. Evans, 456 U.S. 605, 610, 102 S. Ct. 2049, 2052, 72 L.Ed.2d 367 (1982), [Beck v. Alabama, 447 U.S. 625 (1980)] stands for the proposition that "the jury [in a capital case] must be permitted to consider a verdict of guilt of noncapital offense 'in every case' in which 'the evidence would have supported such a verdict.'" Although Beck, strictly speaking, "holds only that a state cannot impose a blanket ban on the giving of lesser-included-offense instructions in a capital case," Reddix v. Thigpen, 805 F.2d 506, 511 (5th Cir. 1986), we have consistently held that Beck's holding applies when the state trial court refuses a lesser

18

included offense instruction. See Reddix, 805 F.2d at 511-12 (applying Beck but finding no violation because evidence did not support lesser included offense); Bell v. Watkins, 692 F.2d 999, 1004-05 (5th Cir. 1982), cert. denied, 464 U.S. 843, 103 S. Ct. 142, 78 L.Ed.2d 134 (1983)(same). [FN2]

> [FN2]: A plain reading of Beck and Hopper inexorably leads to the same conclusion. If due process is violated because a jury cannot consider a lesser included offense that the "evidence would have supported," Beck, 447 U.S. at 627, 100 S. Ct. at 2384, the source of that refusal, whether by operation of state law or refusal by the state trial court judge, is immaterial.

Id. at 767.

The issue in the present case, as in Cordova, is whether a rational jury, given all the facts, could have acquitted defendant of capital murder and convicted him of a lesser included offense. The defendant, Ransom, argues that a rational jury could have acquitted him of capital murder and convicted him of either of two lesser included offenses, noncapital murder or robbery.[5]   We

---

[5]   Ransom was indicted for, and convicted of, capital murder in that he murdered Arnold Pequeno in the course of robbing him. The applicable Texas statute provides, in pertinent part, that a person commits capital murder if he commits murder in the course of committing or attempting to commit robbery. TEX. PENAL CODE § 19.03. Murder occurs when a person intentionally or knowingly causes the death of an individual. TEX. PENAL CODE § 19.02.

disagree.

Ransom points to his testimony and the testimony of his former girlfriend Wanda Phillips as providing sufficient evidence to warrant instruction on a lesser offense. The following relevant facts were found by the state court in post conviction proceedings:

36. During the guilt-innocence phase of trial of the instant case, [Ransom] testified that on the night of June 30, 1983, co-defendant Randle came to Wanda Phillips' apartment three times, and [Ransom] left with Randle after the third time; that the first time Randle came to the apartment, [Ransom] and Randle discussed going to pick up co-defendant Wilkerson's check; that the second time Randle came to Phillips' apartment, Randle requested the return of a pair of jeans; that the third time Randle came to Phillips, [Ransom] and Randle went into the apartment, and Randle picked up a knife; that [Ransom] had no knowledge that Randle was taking the knife from Phillip's [sic] apartment; that the applicant had no knowledge that anyone had a knife; and, that [Ransom] did not know that they were going to do anything but pick up co-defendant Wilkerson's check (R. XXIV - 518-524, 530).

37. [Ransom] further testified, during the trial of the instant case, that [Ransom] played arcade games at the site of the instant offense, Malibu Grand Prix, for about twenty minutes, and then [Ransom] went to the

20

restroom; that [Ransom] saw Randle stabbing a man in the restroom; that [Ransom] tried to prevent the stabbing; that [Ransom] then left Malibu Grand Prix and hid in a ditch; and, that the only reason that [Ransom] took the proceeds from the robbery was because [Ransom] was scared (R. XXIV - 529, 542, 550-51).

38. The Court finds, based on a review of [Ransom]'s testimony during the trial of the instant case, that [Ransom] denied committing any action or having the requisite culpable mental state for the instant offense.

39. During the guilt-innocence phase of the instant trial, witness Wanda Phillips testified that she was with [Ransom] on the evening of June 30, 1983; that co-defendant Randle came to her apartment three times on June 30, 1983; that [Ransom] went outdoors with Randle on all three occasions; that Randle came into the apartment with [Ransom] on the third occasion; that [Ransom] and Randle went into the kitchen and while there someone picked up a knife and Randle said "Oh, man, here's one we can use;" and, that [Ransom] and Randle then left, and [Ransom] assured Phillips that she would get her knife back (R. XXIII - 342-345, 347-349, 351).

40. Witness Wanda Phillips further testified, during the trial of the instant case, that [Ransom] was accompanied by co-defendant Randle, Randle's younger

21

brother, and co-defendant Wilkerson when [Ransom] returned to Phillips' apartment, and that [Ransom] told Phillips, when Phillips went into the bathroom where the applicant was tending to his hand, that he was cut when the other guy tried to grab the knife. Phillips later contradicted her testimony and said that [Ransom] told her that he was cut when he tried to keep Randle from stabbing someone (R. XXIII - 359, 387, 406).

Ex parte Ransom, No. 29,820-01 at pp. 1032-34.

The argument that the jury rationally could have found that Ransom intentionally or knowingly caused the death of Arnold Pequeno but was not involved in the robbery is totally without merit. The testimony of Ransom and Phillips that tended to exculpate Ransom from any crime whatsoever provided a rational basis for the jury to return a verdict of not guilty, and the jury was instructed that a not guilty verdict was permissible. However, the evidence would not have supported a rational finding that Ransom killed Arnold Pequeno outside the scope of the robbery or for any reason other than to further the robbery.

Nor do we believe that a rational juror, after considering all of the evidence, could have convicted Ransom of the robbery while exonerating him of all of the murders. All of the inculpatory evidence consistently tends to prove that he was an active and equal participant in planning, preparing for, committing, and dividing the fruits of the robbery and the murders. The exculpatory evidence, however, consisting of Ransom's testimony and

22

one version presented by Phillips' testimony, indicates that Ransom was implicated in neither offense but went to the crime scene merely to play video games. A second version of Phillips' testimony tends to show that Ransom brandished a knife in confronting one of the victims immediately prior to the killings. The evidence provides no basis for a reasonable inference that Ransom participated in a robbery or attempted robbery but withdrew or somehow disassociated himself from the murders.[6]

_____

[6] Ransom testified that he committed no crime whatsoever. He said that he innocently went to the Malibu Grand Prix with Wilkerson and Randle to play video games, accidently discovered that Randle had fatally stabbed two arcade employees in the restroom, received his hand wound in a futile attempt to disarm Randle before he dispatched a third victim, fled to hide in a ditch momentarily, but, in fear of his life, rejoined his companions after their murders and robbery, accompanied them to Phillips' house, and accepted a share of their ill-gotten loot.

One line of Phillips' testimony was consistent with Ransom's story. In that version, she said that Ransom told her that he did not join in the crimes and was cut when he tried to take a knife away from Randle, and that Randle and Wilkerson said that Ransom had not participated in any of the crimes. If the jury had adopted this interpretation of the evidence, however, it reasonably could not have convicted Ransom of either capital murder or robbery.

On the other hand, the record contains little, if any, evidence that tends to prove the theory that Ransom participated in the robbery but not the homicides. To reach such a conclusion, the jury would have had to reject almost entirely Ransom's testimony and the part of Phillips' testimony consistent with it. Even if the jury had given great weight to Philips' repeated statements that Randle and Wilkerson claimed exclusive credit for all of the crimes, State Trial Court Record vol. XXI at 408-09, 410, 435-36, 445, 448-49, 456, this evidence alone would not have justified Ransom's conviction of robbery, although it would have supported his complete acquittal. The alternate line of Phillips' testimony, in which she said that Ransom stated that he was cut when Randle took the knife away from him while he was struggling with one of the victims, tends to prove Ransom's guilt of both murder and robbery and not one without the other.

There is no evidence in the record that reasonably supports an inference that, if Ransom was not completely innocent, his conduct and mental state was distinguishable from that of his companions, so that he could have been found guilty of robbery, but not of

23

Accordingly, we conclude that in this particular case the jury could have reached but one of two reasonable conclusions, viz., that Ransom was guilty of capital murder or of no crime at all. Because the facts of the case would not have supported a middle view the trial court did not commit constitutional error in refusing to instruct the jury that it could entertain and return a lesser included, noncapital offense verdict.

## IV. CONCLUSION

For the foregoing reasons the application for certificate of probable cause and the motion for stay of execution are DENIED and the appeal is DISMISSED.

---

murder. Accordingly, the evidence of record does not afford any basis for a rational inference or finding that Ransom joined the criminal transaction with the intent only to rob and never formed an intent to cause death to another. Consequently, we conclude that no rational juror could have concluded that Ransom committed robbery without also being implicated in the murders committed in the course of the criminal episode.