**William Prince DAVIS, Petitioner,**

v.

**Gary JOHNSON, Director, TDCJ, Respondent.**

**No. CIV. A. H–98–1415.**

United States District Court, S.D. Texas.

June 2, 1998.

Ken Jerome McLean, Houston, TX, for Petitioner.

Erik E. Cary, Assistant Attorney General, Austin, TX, for Respondent.

## Opinion on Denial of a Writ of Habeas Corpus

HUGHES, District Judge.

### 1. *Introduction.*

A state prisoner under a death sentence seeks to overturn the imposition of that punishment. He claims his counsel ineffectively assisted him. Because he did not file his petition in the allotted time, his petition will be denied. If Davis had met the time limits, his attack on the judgment would still fail because he has not demonstrated that his sentence would have been different if his counsel had tried the case as Davis says he should have.

### 2. *The Murder.*

After a life of crime up to the age of twenty-one, William Prince Davis murdered a store manager, generating the death sentence. On June 2, 1978—yes, '78—Davis robbed the Red Wing Ice Cream Company as the company's drivers returned with their day's receipts. Davis held a .32 caliber pistol on Richard Lang, the manager. Davis shot Lang in the chest in front of several witnesses. Lang died.

Shortly after killing Lang, Davis confessed. He told an officer, "I had to shoot the man. He was going to take the gun away from me." The following day, another officer took his written statement.

### 3. *The Trial.*

Davis was indicted for capital murder and had two lawyers—Tom Dunn and George Pletcher—appointed to defend him. The guilt phase of the trial was brief. On September 18, 1978, Davis was convicted of capital murder.

The more vigorously contestable and contested part of the trial was the punishment. The court asked the jury two questions about the punishment:

#### Issue No. 1

Do you find from the evidence beyond a reasonable doubt that the conduct of the defendant, William Prince Davis, that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result?

#### Issue No. 2

Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant, William Prince Davis, would commit criminal acts of violence that would constitute a continuing threat to society?

The charge informed the jury that a *no* answer to either question would mean life in prison and a *yes* answer to both would mean death. The jury answered both questions affirmatively within hours, and Davis was sentenced to die.

### 4. *Appeals.*

The Texas Court of Criminal Appeals affirmed. *Davis v. State,* 597 S.W.2d 358 (Tex. Crim.App.1980). One of Davis's trial lawyers, Dunn, assisted him in that direct appeal. Davis then filed several unsuccessful state court petitions for writs of habeas corpus. The Court of Criminal Appeals twice denied Davis collateral relief, once in a brief, unpublished opinion and later in a lengthy, published opinion. *Ex parte Davis,* 866 S.W.2d 234 (Tex.Crim.App.1993) (per curiam).

Davis now petitions this court for a writ of habeas corpus, claiming that his counsel was ineffective in (1) failing to have the jury consider Davis's youth in mitigation, (2) failing to object to the prosecutor's equating deliberate and intentional, and (3) failing to present evidence that would have demonstrated an absence of deliberateness. The Texas Court of Criminal Appeals addressed each of these claims in its collateral review. Initially, Johnson did not respond to Davis's arguments; rather, he moved to dismiss Davis's petition on the ground that Davis filed it too late. The court has since received Johnson's response to the merits.

### 5. *Timing.*

■ The threshold issue is: Was Davis's petition filed on time? Because Davis's motion for appointment of counsel and application for a writ of habeas corpus were filed

after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996, it applies to his case. The act sets a limit of one year after the last of a series of events for a state prisoner to file an application in federal court collaterally attacking a criminal judgment. 28 U.S.C. § 2244(d) (Supp.1997). As Johnson admits, Davis is allowed a one-year grace period after the effective date of the AEDPA. *United States v. Flores*, 135 F.3d 1000, 1006 (5th Cir.1998). Under the statute, Davis had to file his petition by April 23, 1997. At his request, however, this court extended the time to May 26, 1997. Parenthetically, this court may have erred in assuming that it had the authority to extend the statutory deadline.

Though the point is far from clear, the court assumes that when Davis moved for appointment of counsel and for an extension of time he satisfied the time limit on initiation. Still, at some point he had actually to file his petition. That point came and went on May 26, 1997. Davis did not file anything—let alone his petition—for over eight months after the extended deadline. Over a year passed between his initial request on February 27, 1997, for an extension and his next request on March 25, 1998, for an extension without Davis's filing anything. He has no explanation for missing the prescribed time as extended. Whether Davis satisfied the original time limit is now academic because he plainly did not file within the ordered time.

Davis may argue that he did not have an attorney even after the court appointed Ken J. McLean to represent him. McLean indicated on the first motion for extension, "Attorney for Petitioner on motion only." He reiterated that in the request itself but said that he would be available to represent Davis fully only if an extension were granted. The lawyer said that he had four other cases with deadlines of April 21. The court granted the extension and appointed McLean attorney of record shortly after the request for counsel and first extension request were filed.

In the second motion for extension, McLean implied that he had only recently learned of his appointment: "On February 19, 1998, I was faxed a copy of an order signed on February 28, 1997, appointing me to represent Petitioner Davis." McLean's

address and telephone on both motions and on the order appointing him are correct. Davis's June 2, 1998, response to Johnson's motion to dismiss reiterates that McLean never knew of the appointment. It fails to explain why, knowing the deadline was approaching in the spring of 1997, he did not check to see whether he had been appointed. Surely he would have inquired about the status of both motions sometime before the expiration of the original deadline even had he not actually known of the orders. None of Davis's papers provides a good explanation for missing the May 26, 1997, deadline.

On February 18, 1998, without realizing that the first-extended deadline had passed, the court inadvertently set a new deadline of April 20, 1998, and on April 3, 1998, extended it again to May 8, 1998, on Davis's request. While the court should have dismissed the petition as time-barred rather than setting the new deadlines, its orders did not prejudice Davis. By that time the court was without power to resurrect the petition. With or without the 1998 deadlines, Davis did not file by May 26, 1997, as ordered. His petition for a writ of habeas corpus is time-barred.

Parenthetically, however, the court questions why Johnson neglected to raise this issue in the eight months of total default by Davis. Johnson knew that Davis had missed the deadline in mid–1997, and he did not oppose Davis's second request for an extension in March of 1998. The people of Texas have not had effective assistance of counsel for some years.

Timing rules work both ways: if the state wants to kill a man because his filings are not on time, it should raise that issue promptly. If limitations applies to Davis, laches should apply to Johnson. Johnson waited until May 1998 to raise a point it knew of in May 1997. Responsible government's prompt objection would have saved everyone time and trouble, especially since the court, Davis, and Johnson are funded by the taxpayers.

Because the government's taking a person's life should invoke the most awesome governmental accountability, the court will address the merits of the petition in an abundance of caution.

### 6. Habeas Corpus.

The writ of habeas corpus is an exercise of judicial power outside the usual hierarchy of suits and appeals. Since before the Constitution was ratified in 1789, the writ has protected individuals from wrongful punishment. It allows individuals to question their criminal convictions when they believe they are being held in violation of the law of the United States. The writ gives the federal courts the power to reconsider a state's trial and appellate conclusions.

The state of Texas has the power to kill a person as punishment. If that decision is constitutionally sound, both in substance and in process, it must be affirmed by the federal courts. Texas is wholly bound by the United States laws and constitution. This court's narrow, yet careful, review exists only to ensure that the state met its responsibility to afford full constitutional protections to a man it has sentenced to die. The standards must be high when the penalty is death.

### 7. Ineffective Assistance.

The Constitution requires that a defendant have a lawyer because an accused on his own cannot focus his case through the complex lens of the legal process without professional assistance. U.S. Const. Amend. VI. Reasonable help that precludes substantial injustice—rather than perfect lawyering—is required.

▮ To prove that his counsel did not effectively assist him under the Constitution, Davis must show that their performance was deficient *and* that the deficiency prejudiced him.

- Deficiency. His counsel must have made errors so serious that he did not have reasonably competent help, denying him a reasonable opportunity to present his best positions through proper means. Counsel's conduct must fall outside the bounds of prevailing, objective professional standards. Mere adequacy—not perfect justice—is all that is required.
- Prejudice. The defendant must show a reasonable probability—sufficient to undermine confidence in the outcome—that the result would have been

different absent counsel's deficient performance.

*Strickland v. Washington,* 466 U.S. 668, 687, 694, 104 S.Ct. 2052, 2064, 2067, 80 L.Ed.2d 674 (1984); *United States v. Blankenship,* 923 F.2d 1110, 1117 (5th Cir.1991).

▮ This court's examination of counsel's performance is highly deferential; the law strongly presumes that counsel's performance was adequate and that choices by counsel at trial were tactical. *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065; *United States v. Green,* 882 F.2d 999, 1003 (1989). The factual findings by the state court benefit from a presumption that they are correct. 28 U.S.C. § 2254(d); *Marshall v. Lonberger,* 459 U.S. 422, 432, 103 S.Ct. 843, 850, 74 L.Ed.2d 646 (1983); *Sumner v. Mata,* 449 U.S. 539, 547, 101 S.Ct. 764, 769, 66 L.Ed.2d 722 (1981).

Even if counsel did err, Davis is not entitled to relief unless the error substantially affected the jury's likelihood of rendering a verdict less adverse to Davis. *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946). Irrespective of the precise formulation of these issues, one of the purposes of the great writ is to allow an independent judiciary to ascertain "whether the result of the proceeding was fundamentally unfair or unreliable." *Lockhart v. Fretwell,* 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993).

### 8. Youth.

▮ Davis's first claim is that his counsel ineffectively presented his youth to the jury in mitigation of his punishment. During voir dire, the prosecutor received explicit guarantees from some members of the venire who were selected as jurors that they would not consider Davis's youth to mitigate his responsibility. In his closing, the prosecutor reminded the jurors of that guarantee. Davis's counsel did not object.

Davis says that the failure to object constituted deficient lawyering. He argues that the jury might well have imposed a lesser sentence had it been "allowed" to consider his age. As murders go, Davis says, his was not particularly gruesome since he fired only

one shot and killed only one person. He urges that this was not a murder from which a death sentence inexorably flowed and that a jury properly considering Davis's age might well have rejected that sentence. He argues that the prosecutor's statements to the jury, without objection, foreclosed the jury from considering youth as mitigation.

### A. *Deficiency.*

The prosecutor led the jury to believe that it *could not* consider Davis's youth, and Davis's counsel did not object. Davis's counsel probably technically erred in not objecting to the prosecutor's statements about youth.

Because youth seems to be correlated with current dangerousness—but not necessarily future dangerousness—it *can* be a mitigating factor. *Johnson v. Texas,* 509 U.S. 350, 367, 113 S.Ct. 2658, 2669, 125 L.Ed.2d 290 (1993). Because the young become less likely to commit crimes as they age, present youth may negate future dangerousness. The question on future dangerousness is sufficient to allow the jury to consider mitigating evidence; no explicit instruction about mitigating circumstances is required. *See Turner v. Johnson,* 106 F.3d 1178, 1189 (5th Cir.1997); *Spivey v. Zant,* 661 F.2d 464, 471 & n. 10 (5th Cir. Unit B Nov.1981). Nor is a special instruction on youth required; the second special issue allows the jury to consider youth in mitigation. *Tucker v. Johnson,* 115 F.3d 276, 281–82 (5th Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 605, 139 L.Ed.2d 492 (1997); *Graham v. Collins,* 950 F.2d 1009, 1029–1032 (5th Cir. 1992) (en banc), *aff'd,* 506 U.S. 461, 113 S.Ct. 892, 122 L.Ed.2d 260 (1993). *See also Johnson,* 509 U.S. at 370, 113 S.Ct. at 2670 ("[N]o additional instruction beyond that given as to future dangerousness was required in order for the jury to be able to consider the mitigating qualities of youth presented to it."). Davis's jury was not foreclosed, at least by the court, from considering Davis's youth in mitigation.

While technically deficient, not making that particular attack on the state's position in the context of the trial as a whole was not below the standard of reasonably competent counsel in serious cases.

### B. *Prejudice.*

Even if this court assumes Davis's counsel was deficient in failing to object, four things preclude it from finding that the deficiency prejudiced Davis's defense.

### (1) *Objections.*

Whether Davis's counsel erred is a distinct question from whether that error caused Davis's counsel's performance as a whole to be substandard. A murder trial is not a collegiate debate, and every opportunity to object carries a danger of negative reaction from the jury and a powerful response from the other side.

At the punishment phase, the jury had the evidence of Davis's age, the court's instructions, and Davis's argument that his age mitigated against death. The jury also had the state's argument that age did not count. One way to evaluate the importance of the missing objection is to consider the probable consequences of its having been made.

If it had been made, the court might have overruled it with the customary one word announcement. That error would have been part of the direct appeal on inadequate presentation of youth; the addition of this one extra "point" would not have materially changed the weight of that issue on appeal.

If it had been made, the court might have sustained it with the customary four-word instruction, "Disregard the last argument." This correct ruling would not have changed the substance of the state's position in argument; the state did argue—and would have continued to argue—that the jury should not use Davis's youth in mitigation even if they could consider it.

With or without the objection, the jury could account for mitigating factors in their answers to the penalty questions. Mitigating evidence and Davis's argument on how to use it was within the effective reach of the sentencer; the objection is essential to competent representation only if in its absence it was reasonably likely that the jury would have considered themselves foreclosed from using youth in answering one of the penalty

issues *no. Johnson*, 509 U.S. at 367–70, 113 S.Ct. at 2669–70.

### (2) *Instructions.*

Though the prosecutor told the jury that it could not consider Davis's youth, the final instruction given to the jury by the court in the punishment phase charge was:

> You are the exclusive judges of the facts proved and the credibility of the witnesses and the weight to be given their testimony, but you are bound to receive the law from the Court which has been given you and you are bound thereby.

(Tr. at 22). Although the court did not tell the jury to consider youth specifically or mitigating factors generally and although the prosecutor told the jury not to consider youth, the second question allows the jury to consider youth as mitigation. The court told the jury that the charge was the law.

### (3) *Argument.*

Davis's counsel quite plainly made the youth argument:

> This man a year-and-a-half—remember this—a year-and-a-half of free time in a whole life of twenty-one years. He is still young. He still has an enormous amount of maturity if you see fit to spare him, to grow and to comprehend, which I believe is probably his greatest failing, the complete comprehension of life and what's going on in this world around him.... [T]he full comprehension of everything in life itself and the duties herein he has not received.... [Y]ou can't possibly, you cannot possibly say that this man is beyond reform ....

(Tr. at 1131–32). Davis's age was not concealed from the jury; it was in evidence, and both sides argued its significance for punishment. The jurors had the means to use Davis's youth to respond in his favor if they concluded the evidence affected the substance of those inquiries. Since the court did not foreclose the jury directly or indirectly from considering youth, the jury presumably considered and clearly rejected it.

### (4) *Countervailing Interpretation.*

Finally, even if the jury had been expressly told by the court to consider mitigating circumstances in general and youth in particular and even if defense counsel had objected to the prosecutor's statements (or, better yet, the prosecutor had never made them) the result would not have been different.

While youth *can* be mitigating, it is less than implausible that youth *would* have been a mitigating factor in this case. As Davis admits in his petition, by the time he was twenty-one he had been convicted for burglary and three aggravated robberies. He used a pistol and took a hostage in one of the robberies. He held a butcher knife on a pregnant woman in another. He committed at least five robberies and fifteen burglaries between his last parole and his arrest for Lang's murder. Virtually all of his teenage years were spent in custody. He admitted that during the year-and-one-half that he was not in jail he committed over twenty felonies. He confessed in writing to burglarizing the Red Wing Ice Cream Store the week after he murdered Lang there.

A jury would be hard-pressed to chalk Lang's death up to the vagaries of youth. Davis was already a hardened criminal when he killed Lang. Properly considered, his youth was an exacerbating—not mitigating—factor. *See Ransom v. Johnson*, 126 F.3d 716, 724 (5th Cir.) (concluding that a petitioner failed to show prejudice from counsel's deficiency in failing to investigate and offer mitigating evidence where potential mitigating evidence was outweighed by evidence heard by jury at guilt phase of trial), *cert. denied*, —— U.S. ——, 118 S.Ct. 361, 139 L.Ed.2d 281 (1997). Even if Davis's counsel's failure to object to the prosecution's statements on youth was deficient, the result of the trial would not have been different. Because Davis is unable to show prejudice, his first ineffective assistance claim fails.

### 9. *Intentional Versus Deliberate.*

Davis claims that his counsel failed adequately to maintain the distinction between an intentional and a deliberate killing, especially by failing to object to the prosecutor's equating the two.

The trial court instructed the jury that to convict Davis of capital murder, it had to find that

the defendant shot Richard Walter Lang with the intention of thereby killing him. Unless you find from the evidence beyond a reasonable doubt that the defendant, on said occasion, *specifically intended to kill* the said Richard Walter Lang when he shot him, if he did shoot him, you cannot convict him of the offense of capital murder.

Intent was defined: "A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result."

At the punishment phase, the jury had to find that Davis's conduct was deliberate, not merely intentional, to impose death. *Lane v. State,* 743 S.W.2d 617, 628 (Tex.Crim.App. 1987). To convict Davis of capital murder in the first place, the jury had to find that he acted intentionally; to impose the death sentence, the jury had to find that he acted deliberately. "Deliberate" is commonly understood as narrower than "intentional," yielding a higher standard. It connotes at least a flash of reflection and at most premeditation. While "intentional" implies he desired the act and, inferably, its consequences, "deliberate" means he acted on consideration rather than reaction. To support the jury's decision the evidence must have shown that the defendant's killing the victim resulted from a conscious decision to cause the death of the victim—a conscious decision stronger than mere intent but weaker than premeditation. *Lewis v. State,* 911 S.W.2d 1, 6 (Tex.Crim.App.1995).

Texas courts have "properly declined to assume a legislative function and define 'deliberate', and instead relied on the 'ordinary meaning' of the term as a juror individually knows it." *Lane,* 743 S.W.2d at 628. Terms like "deliberately," "probability," "criminal acts of violence," and "continuing threat to society" have a common-sense core of meaning that juries are capable of understanding. *See Tuilaepa v. California,* 512 U.S. 967, 973, 114 S.Ct. 2630, 2636, 129 L.Ed.2d 750 (1994).

### A. *Deficiency.*

In his closing argument, the prosecutor told the jury that the two standards were the same and that anything other than an accidental killing was deliberate; he told the jury that they had essentially found deliberation when they convicted Davis. Davis's lawyer did not object. Davis says his lawyer did not ask him why he shot Lang or to recall Lang's provocation or Davis's reaction. Davis complains that his lawyer did not correct Davis's equating the two standards when he was cross-examined and, he says, seemed to confuse them himself in his closing. On closing, Davis claims, his lawyer did not try to get the negative finding on deliberate or argue that deliberate could mean less than premeditation.

Davis's testimony that he did not *intend* to shoot Lang negates deliberation, if it persuaded the jury; it did not. Still, to the extent that the jury was left with the impression that the two standards were the same, Davis's counsel quite clearly drew the distinction between them. For Davis, Dunn said:

> We just say that he did not go into the Red Wing store to murder and kill the witnesses so they would not be able to appear again before you. He went in there, and from his position in life—remember—a brave man, Mr. Lang, came toward him, causing him to panic in a situation he had not dreamed could exist, into which he reacted horribly, wrongly and shot him. It wasn't. He could have shot again. He could have shot the other man. That doesn't excuse it. I'm not trying to say that. I'm merely trying to say that perhaps that point might be separated from the death penalty by the razor's edge because he did not intend to kill. He went in there to rob.

(Tr. at 1129).

> He is not like the organized criminal who plans in advance to murder his victim. It was the furthest thing from his mind.

(Tr. at 1133).

Also for Davis, Pletcher drew the distinction between deliberation and intent about as well as it can be drawn:

> You know when you were asked yesterday about the innocence or guilt of William Prince Davis the Court asked you, as he must in accordance with the will of the State, "Was this an intentional act?" And

there was no doubt it was an intentional act, and you so found as you should have so found.

Now for some reason, again because of the will of the State, you are asked a different question. You are asked, "Was the conduct deliberate? Was the conduct deliberately done with the reasonable expectation that death would occur?"

Now, what is the difference between intentional and deliberate? ... But what is deliberate?

When Mr. Sparks questioned you, many of you if not all of you, he talked about synonymous words, synonyms as he put it. What is the synonym for deliberate? Considered. Advised. Premeditated. Designed. Studied. Deliberate also indicates full and unhurried awareness. As he talked about deliberate conduct, I sought to find out what that word meant, and these are meanings of that word.

Why do you suppose that when you go back to do your duty it is called deliberation? It is because what you do must be deliberate. You must design and study and consider and advise. You must premediate before what you do is considered a deliberate act....

Now that very same question is asked about his conduct. And please do not in any way think that Tom Dunn and I in our responsibility here are attempting in any way to detract from the dreadfulness, from the enormity of the wrongness that William Prince Davis did. He deliberately by plan, by design, by premeditation, by advice, and through considered judgment robbed that store. And what he did in pulling the trigger that struck down Mr. Lang is in no way and can never be in any manner justified, nor has it ever been claimed to have been justified. It was a dastardly, treacherous, evil act. But was it deliberate? Was it planned? Was it premeditated? Was it designed? Was it reasoned? Was it, did it indicate full and unhurried awareness?

That's a question you must answer, and you as honorable and intelligent men and women must answer that question either yes or no.

(Tr. at 1137–40). Davis's petition admits that counsel made some argument along these lines. (Davis's Petition at 25).

Davis's lawyers effectively distinguished the two standards. While failing to object to the prosecutor's description of the standard is technically deficient, it was not an indicium of incompetence in the trial as a whole considering the tactical advantages and disadvantages probably resulting from an objection.

### B. *Prejudice.*

Assuming that the lack of an objection was deficient, however, it did not in reasonable probability change the outcome. Had Davis's counsel objected to the prosecutor's argument, the trial court probably would have sustained it, struck it, and instructed the jury to disregard it. The trial court did not do even that much during Pletcher's closing argument, when the prosecutor objected to Pletcher's characterization of threat to society:

> Mr. Sparks: Object to that, Your Honor. It's a misstatement of the law. The jury is to answer the question based upon the existing facts and is to answer the question as to the present day, today.
>
> The Court: All right.

(Tr. at 1141). Even with an objection, the sentence would not have changed. The court instructed the jury that it had to find that Davis acted deliberately, and Davis's lawyers thoroughly articulated the difference between intentional and deliberate. No fact suggests that the jury would have sentenced Davis differently if it had heard the court say, "Disregard the last argument."

Two years after the appeal in this case, a Texas court found a series of errors about the distinction to vitiate the justice of a capital sentence. In that case the prosecutor, using hypothetical questions on voir dire, equated deliberate and intentional. *Lane v. State,* 743 S.W.2d 617 (Tex.Crim.App.1987). The trial court repeatedly prevented the defense lawyer from asking prospective jurors questions about the two standards. The defense had to use all of its peremptory challenges, and an extra one, to strike jurors

with whom the prosecution had confused the standards. The defense then ran out of challenges, and the last juror seated was a person who had admitted to being confused by the two standards. While the Court of Criminal Appeals correctly declined to "condone an attempt by a State's attorney to mislead a juror into believing the definition of deliberate conduct is nothing more than a second finding of intentional conduct," in this case it did not see the same pattern of abuse or it would have said so when it considered Davis's contentions the three times it reviewed his treatment. *Id.* at 628.

Among the facts that distinguish Davis's case from Lane's is that the trial court here did not block the defense's examination of the venire about the distinction. The prosecution in Lane's case confused the standards, but the last seated juror actually made statements during voir dire that indicated he did not properly understand the difference between intentional and deliberate. In this case, while the prosecution made arguments falsely equating the standards, there is no indication that the jurors were confused by the argument. There are no juror statements indicating confusion, and the defense countered the prosecution's argument. Nothing in this case indicates that a juror actually believed that a "less rigid standard of proof was required." *Id.* at 628.

The defects Davis lists had no reasonable probability of causing the jury to have sentenced Davis differently than it did.

10. *Evidence of Reaction.*

■ Finally, Davis complains of his counsel's failure to introduce evidence that might have suggested that Davis did not deliberately kill Lang. During the guilt phase of the trial, Davis attempted to offer the testimony of Officer Robert Deloney. During Davis's oral confession, shortly after the killing, he told Deloney, "I had to shoot the man. He was going to take the gun away from me." Davis says this and other evidence corroborates his story that he was reacting to Lang's moving toward him. The court excluded it as irrelevant to guilt.

Davis now argues that his counsel should have introduced that testimony during the punishment phase, that his failure to do it was incompetence, that the testimony would have been admitted, and that it would have made a difference by demonstrating that Davis did not deliberate.

According to Davis, Deloney's testimony was the best evidence of non-deliberation because Davis's statement to Deloney was near the time of the killing and contemporaneous with his confession, making it more credible than Davis's testimony to the same effect at trial.

Assuming that failing to introduce the testimony was error, the absence of that particular testimony has no reasonable probability of changing the result because the jury already had similar evidence that it considered and rejected. The essence of Davis's statement to Officer Deloney was before the jury. Davis took the stand. He told the jury that he did not mean to kill Lang. Davis testified:

I'd like to say to the Lang family that I'm sorry. I never really intended for what happened to happen.

(Tr. at 1094).

Q. [The gun] was already pointed at him, wasn't it?

A. Yeah. After he jumped in front of it.

(Tr. at 1105–06).

Q. Well, how do you go about shooting somebody if you had never shot a gun before?

A. Well, I didn't intend to shoot him. Like I said, really he scared me just as much as it probably scared everybody in that room.

Q. Well, there's not any question that you and Murphy and Darrow had planned and thought out and deliberated over robbing that Red Wing Ice Cream store, is there? You talked that over and planned it?

A. Yes.

Q. Did you plan or talk over the shooting of anybody?

A. No.

(Tr. at 1095).

Q. So you deliberately pulled the trigger on that gun; is that true?

A. I ain't going to say deliberately.

Q. You're not going to say deliberately?

A. Yeah.

Q. Why not?

A. Because like I said, I never intended to kill Mr. Lang, although it was my hand that shot the gun.

Q. At the time you pulled the trigger, you did.

A. No, I didn't.

Q. What did you think was going to happen?

A. What did I think was going to happen?

Q. Yeah.

A. Well, I thought it was going to hit him in the stomach.

Q. And you think he wouldn't be dead if you had shot him with a .32 caliber pistol in the stomach?

A. Right. Really, I panicked, if you just really want to know.

(Tr. at 1108–1109).

Davis essentially told the jury in person the substance of what he told Deloney—that he did not deliberately shoot Lang. Additionally, the state's first exhibit was Davis's written confession, and it said, "I stood in the doorway and said 'Don't nobody move.' As I was saying this a man was moving toward me and I shot him one time." *See Westley v. Johnson,* 83 F.3d 714, 722 (5th Cir.1996) (concluding that counsel's failure to review transcripts from a co-defendant's trial was deficient but not harmful because counsel had elicited most of the same exculpatory testimony at his client's trial and that benefit from using the full record from the other trial would have been "minimal" or "marginal," which is insufficient "to undermine confidence in the jury's verdict"), *cert. denied,* —— U.S. ——, 117 S.Ct. 773, 136 L.Ed.2d 718 (1997).

Again, Davis cannot show that in reasonable probability the result of the trial would have been different. There was ample physical and oral evidence of Davis's position from which the jury could find deliberation.

### 11. *Capital Punishment.*

The government's use of the death penalty is both popular and controversial. Both the popularity and controversy are misguided. Aside from vengeful retribution and insipid moralism, no rule can be sound jurisprudentially if it generates a complex, convoluted, lengthy, and expensive process.

The death penalty has three principal defects. First, the state probably ought not be allowed to do things it cannot undo because it is at least as error prone as other human organizations. Second, the state spends scarce resources on capital punishment that are badly needed elsewhere; Texas spends about $20 million a year more in accomplishing death sentences than it would cost to convict and maintain them for life without parole. *See* Dan Grothaus, HOUSTON POST, Dec. 7, 1986. In this case, Davis has been on death row for twenty years. Third, the death penalty attracts the attention of law enforcement, prosecution, courts, and the public to gruesome, sensational, but largely irrational, episodic murders, deflecting that attention from the routine crimes that actually destroy the quality of life generally.

Beyond those practical factors, reasonable people question whether the infliction of death does not undermine our society's humanity much more than it deters the beasts among us. It is bad policy, and it may be immoral, but it is constitutional.

### 12. *Conclusion.*

Davis's petition is time-barred. Even if it were not, he had effective assistance of counsel. No doubt, Davis's counsel could have done some things better, but imperfect is not ineffective. Even if Davis's counsel were deficient, there is simply no indication, much less a reasonable probability, that the deficiency made a difference in the sentence. "Though the penalty is great and our responsibility heavy, our duty is clear." *Rosenberg v. United States,* 346 U.S. 273, 296, 73 S.Ct. 1152, 1164, 97 L.Ed. 1607 (1953) (Clark, J.). Davis's petition for a writ of habeas corpus will be denied.

### Final Judgment

1. William Prince Davis's petition for writ of habeas corpus (# 1) is denied.

2. William Prince Davis's motion to stay his execution (# 3) is denied.

3. William Prince Davis's anticipated motion to stay the execution until an anticipated appeal is heard is denied.